**UNITED STATES, Appellee,**

v.

**Richard W. HOWELL, Private
U.S. Army, Appellant.**

No. 67,351.
CM 9002110.

U.S. Court of Military Appeals.

Argued Oct. 5, 1992.

Decided March 25, 1993.

For Appellant: *Captain Antonier L. White* (argued); *Lieutenant Colonel James H. Weise* and *Captain Alan M. Boyd* (on brief); *Captain Robin L. Hall.*

For Appellee: *Major Joseph C. Swetnam* (argued); *Colonel Dayton M. Cramer, Lieutenant Colonel Daniel J. Dell'Orto, Captain Marcus A. Brinks* (on brief); *Lieutenant Colonel Joseph A. Russelburg.*

*Opinion of the Court*

SULLIVAN, Chief Judge.

Appellant was tried by a special court-martial composed of officer and enlisted members at Fuerth, Germany, during July and August 1990. Contrary to his pleas, he was found guilty of conspiracy to possess and distribute marijuana; possession of marijuana; and distribution of that drug, in violation of Articles 81 and 112a, Uniform Code of Military Justice, 10 USC §§ 881 and 912a, respectively. He was then sentenced to a bad-conduct discharge, as well as confinement and forfeiture of $482.00 pay per month for 3 months. A post-trial session under Article 39(a), UCMJ, 10 USC § 839(a), was held to resolve ambiguities in the order amending the appointing order. The convening authority approved the sentence on October 26, 1990. The Court of Military Review affirmed on August 26, 1991, in an unpublished opinion.

On February 27, 1992, this Court granted the following issue for review:

> WHETHER THE MILITARY JUDGE ERRED TO THE SUBSTANTIAL PREJUDICE OF APPELLANT BY NOT INSTRUCTING THE PANEL ON THE DEFENSE OF ENTRAPMENT AS REQUESTED BY THE DEFENSE.

We hold that the military judge did not err in refusing to give an entrapment instruction in this case because the evidence of record did not warrant it. *See United States v. Clark,* 28 MJ 401 (CMA 1989); *United States v. Sermons,* 14 MJ 350 (CMA 1982); *see generally United States v. Gunter,* 741 F.2d 151, 153 (7th Cir.1984).

■ The Government's chief witness against appellant was Private First Class Smith, a soldier working undercover for the Criminal Investigation Command (CID). He was temporarily assigned to Ansbach, Germany, as part of an operation called "Drug Task Force." His job was "to go into the GI bars and meet soldiers"; begin "conversations about illegal drugs"; and ask those soldiers to sell him or help him acquire these drugs. His activities with respect to appellant and a Private Cardinale led to their purchases of hashish from a Turkish National in a Burger King and later outside the "Irish Pub" at Nuernberg. They then gave the hashish to the under-cover agent after taking some for themselves for conducting the transactions.

The record reflects the following testimony from Private Smith concerning his pre-transaction activities:

Q. Do you know the accused in this case?

A. Yes, sir. I do.

Q. And how do you know him?

A. During the month of April I was selected to participate in the Drug Task Force in Ansbach, and I had met the accused on 12 April of '90.

Q. And where did you meet him at this first meeting?

A. In the Liberty Bell bar in Ans-bach.

Q. Was he alone when you met him?

A. No, sir. He wasn't. He was with Cardinale.

Q. And you didn't know him as Cardi-nale at the time?

A. No, sir. I knew him as "Cisco."

Q. Now, when you met him that night, did you discuss drugs at all?

A. Yes, sir. We did.

Q. *And what basically—what was the nature of that conversation?*

A. *They had informed me that they had purchased Hash in the past, and we had arranged for a transaction on 13 April.*

Q. So you agreed to meet them again later?

A. Yes, sir.

Q. What happened after that?

A. After that we arranged a date, at 2000, inside the Liberty Bell, on 13 April. Howell stated that was too late and we needed to move the time up to 1700; and since the Liberty Bell would not be open at that time, we could meet at Mc-Donald's, and then depart to Nuernberg.

Q. Then what happened?

A. That was basically it on the 12th.

Q. Then when was the next time you saw them?

A. The next time I went, I went on the 13th to McDonald's, at 1700, to make contact with them. Neither one of them was around. They looked like they might frequent the Liberty Bell, so I went back to the Liberty Bell at around 2000, the evening of the 13th. Cardinale and Cisco—I mean, Cardinale and Howell was inside the establishment, the Liberty Bell.

Q. Okay, What happened then?

A. I approached the table that they were sitting at, and I asked them, I told them that I wasn't going to be able to conduct a transaction on this night.

Q. And were both Cardinale and Howell present during this conversation?

A. Yes, sir.

Q. *Now, who did most of the talk-ing?*

A. *Cardinale did most of the talk-ing. And whatever he stated, it was as them, he and Howell, done specific things together. When he spoke of smoking Hashish, or buying Hashish, he stated he and Howell both done it.*

Q. *Did Howell act like this was all a bunch of lies? Or how did he react?*

A. *No, sir. He elaborated on a lot of the stuff that Cardinale was empha-sizing.*

Q. What happened next?

A. After that, you know, he just went into general conversation; and we de-parted the establishment. I made con-tact then with them later that evening to confirm the transaction on the 14th of April. That is when we arranged to

leave at 1900, on 14 April, to go to Nuernberg. They were supposed to meet me outside the main gate of Barton Kaserne.

Q. What happened when you showed up there?

A. I showed up on 14 April, at 1900. Neither Howell or Cardinale was outside the main gate. So I proceeded to enter the Kaserne, and located Charlie Company, 141 Signal. And I approached the CQ desk, and inquired, you know: Where was Howell's room? The CQ gave me directions to Howell's room, and I went to the room and knocked on the door and entered.

Q. Who was there when you arrived?

A. Cardinale.

Q. Anyone else?

A. No, sir. It was just Cardinale and Howell in Howell's room.

Q. So both Howell and Cardinale were in the room?

A. Correct.

Q. What happened next?

A. I inquired why they wasn't outside the main gate, you know, like I had instructed them to, and you know, how everything was arranged. *They stated they could—out of their window they could see the main gate, and that at 1900 they didn't see me out there waiting for them. So they didn't go out and wait.*

Q. So what did you guys do next?

A. I asked them if they still wanted to conduct a transaction on this evening. They looked at each other and conversed amongst themselves. Howell asked Cardinale: Did he still want to go on this evening? Cardinal[e] stated, you know, "Sure. We are not doing anything."

Q. Who stated that?

A. Cardinale.

Q. Okay.

A. And Cardinale said he was going to go to his room and get ready, take a shower, and he would return briefly, and we would depart and go to Nuernberg.

Q. Then what happened?

A. After everyone was prepared to go to Nuernberg, we departed the barracks, entered the covert vehicle, and we were on the road to Nuernberg.

(Emphasis added.)

Defense counsel later requested an instruction from the military judge on the defense of entrapment. The following ensued:

MJ: Now, defense counsel, you did submit instructions that you wanted; is that correct?

DC: That is correct, Your Honor. You have the original copy there.

MJ: Fine. We will have that marked. Do you have a copy of this?

TC: Yes. I have a copy.

MJ: That will be fine. What we will do is, I will look at those instructions, and I will determine the instructions I plan on giving. And we will come back on the record.

DC: Yes, sir.

TC: One other item: The Government would contend that the defense, through its cross-examination, had elicited some evidence of entrapment. And we would argue that the Government now has the opportunity to introduce any other 404(b) material to rebut that defense.

MJ: Well, but, Government, you rested. And I think the issue—Are you conceding that entrapment has been raised in this case?

TC: No, Your Honor. We rested on our case in chief, and the defense rested. We didn't know whether the defense was going to present evidence or not. When they did, we have the right to rebut.

MJ: But they haven't, so there's nothing to rebut. We can discuss the issue of entrapment right now. What is the position of counsel? Are you conceding that entrapment has been raised?

TC: No, Your Honor. However, just through defense counsel's cross-examination of the witnesses he seems to be raising that issue.

MJ: The question is: Do you concede that the affirmative defense of entrapment has been raised?

TC: Does the court intend to instruct on entrapment?

MJ: That is what we are going to discuss. Defense counsel, do you want an instruction on entrapment?

DC: Yes, Your Honor. We do.

MJ: And what is the basis for wanting an instruction on entrapment?

DC: Your Honor, the defense contends that the Government evidence in and of itself raises the entrapment defense in the case.

MJ: Give specifics that you feel that the Government's case has raised the issue of entrapment.

DC: Your Honor, we point specifically to the evidence that was elicited at trial. The evidence disclosed that PFC Smith met with Private Howell and—with PFC Cardinale and Private Howell two days before this transaction, and that he set up several meetings with them which they missed. The defense would contend that that could be evidence that PFC Cardinale and Private Howell were reluctant to actually go through with this transaction; and it was only when PFC Smith went to their barracks room and talked to them did they agree to go. Secondly, the evidence shows that, although Private Howell was given 50 Marks to conduct a transaction, that 50 Marks later ended up with PFC Cardinale. And PFC Cardinale, in fact, conducted the transaction himself. Looking at Private Howell's statement, he stated, in his sworn statement, that he had never purchased Hashish before. All that together, Your Honor, the defense contends, raises the defense of entrapment, and the court should be instructed upon it.

TC: Your Honor, as we cited the cases in our original response to the Motion *in Limine,* it is our understanding if the defense of entrapment is raised, the cases clearly show any prior miscon-duct related to drug activity by this accused is admissible to rebut his lack of knowledge, or the fact that he was an innocent bystander, or any other affirmative defenses. The defense counsel is raising the defense of entrapment. And, therefore, the evidence of the trip to Amsterdam and purchasing and using drugs up there and before, clearly rebuts that contention; and the members should hear that before deciding whether entrapment is a proper defense in this case.

MJ: Well, do you believe the affirmative defense of entrapment has been raised?

TC: Your Honor, the Government feels that the evidence does not raise the defense of entrapment. We contend there was no entrapment and no evidence of entrapment; but that if the court is going to be instructed on it,—

MJ: Do you object to an instruction on the affirmative defense of entrapment?

TC: Well, if there is no evidence of it, Your Honor, we don't feel that it is an appropriate instruction.

MJ: That answers my question.

TC: Yes, sir. It will merely confuse them as to their role or their duty today.

MJ: It is the opinion of this court that the affirmative defense of entrapment has not been raised. And I don't intend to instruct them on entrapment.

TC: Yes, sir.

MJ: Do you object?

DC: Yes, Your Honor.

----------

The history of the defense of entrapment as a matter of civilian and military law was exhaustively detailed by then Chief Judge Everett speaking for this Court in *United States v. Vanzandt,* 14 MJ 332 (CMA 1982). The recent decision of the Supreme Court in *Jacobson v. United States,* ––– U.S. –––, –––, 112 S.Ct. 1535, 1543, 118 L.Ed.2d 174 (1992), and its approval of the congressional-intent analysis of *Sorrells v.*

*United States*, 287 U.S. 435, 448, 53 S.Ct. 210, 215, 77 L.Ed. 413 (1932), confirms our substantive-criminal-law approach to this defense. To the extent that RCM 916(g), Manual for Courts–Martial, United States, *1984,* conforms with the Supreme Court's and our Court's understanding of this defense, its pronouncements have the force of law. *United States v. Tatum,* 36 MJ 302 (CMA 1993). *See United States v. Whittle,* 34 MJ 206 (CMA 1992). *See also United States v. Mance,* 26 MJ 244, 252 (CMA), *cert. denied,* 488 U.S. 942, 109 S.Ct. 367, 102 L.Ed.2d 356 (1988). *Cf. United States v. Smith,* 13 USCMA 105, 119, 32 CMR 105, 119 (1962).

A majority of the Supreme Court delineated the contours of this defense in *Jacobson v. United States, supra,* as follows:

[T]here can be no dispute that the Government may use undercover agents to enforce the law. "It is well settled that the fact that officers or employees of the Government merely afford opportunities or facilities for commission of the offense does not defeat the prosecution. Artifice and stratagem may be employed to catch those engaged in criminal enterprises." *Sorrells v. United States,* 287 U.S. 435, 441, 53 S.Ct. 210, 212, 77 L.Ed. 413 (1932); *Sherman v. United States,* 356 U.S. [369], at 372, 78 S.Ct. [819,] at 820 [, 2 L.Ed.2d 848] [ (1958) ]; *United States v. Russell,* 411 U.S. 423, 435–436, 93 S.Ct. 1637, 1644–1645, 36 L.Ed.2d 366 (1973).

*In their zeal to enforce the law, however, Government agents may not originate a criminal design, implant in an innocent person's mind the disposition to commit a criminal act, and then induce commission of the crime so that the Government may prosecute.* *Sorrells, supra,* 287 U.S., at 442, 53 S.Ct., at 212; *Sherman, supra,* 356 U.S., at 372, 78 S.Ct., at 820. Where the Government has induced an individual to break the law and the defense of entrapment is at issue, as it was in this case, the prosecution must prove beyond reasonable doubt that the defendant was disposed to commit the criminal act prior to first being approached by Government agents. *United States v. Whoie,* 288 U.S. App.D.C. 261, 263–264, 925 F.2d 1481, 1483–1484 (1991).

*Thus, an agent deployed to stop the traffic in illegal drugs may offer the opportunity to buy or sell drugs, and, if the offer is accepted, make an arrest on the spot or later.* In such a typical case, or in a more elaborate "sting" operation involving government-sponsored fencing where the defendant is simply provided with the opportunity to commit a crime, the entrapment defense is of little use because the ready commission of the criminal act amply demonstrates the defendant's predisposition. *See United States v. Sherman,* 200 F.2d 880, 882 (CA2 1952). *Had the agents in this case simply offered petitioner the opportunity to order child pornography through the mails,* and petitioner—who must be presumed to know the law—*had promptly availed himself of this criminal opportunity, it is unlikely that his entrapment defense would have warranted a jury instruction. Mathews v. United States,* 485 U.S. 58, 66, 108 S.Ct. 883, 886, 99 L.Ed.2d 54 (1988).

—— U.S. at —— – ——, 112 S.Ct. at 1540–41 (emphasis added; footnote omitted).

▬ The bottom line is that entrapment has two elements: government inducement and an accused with no predisposition to commit the offense. *See United States v. Whittle,* 34 MJ at 207–08. *See generally* RCM 916(g). One federal Court of Appeals has said:

Entrapment is designed to prevent the conviction of the "unwary innocent" induced by government action to commit a crime. *It does not, however, protect the "unwary criminal." United States v. Russell,* 411 U.S. 423, 429, 93 S.Ct. 1637, 1641, 36 L.Ed.2d 366 (1973). A defense of entrapment has two elements: government inducement of the crime and the absence of predisposition on the part of the defendant. To be entitled to acquittal as a matter of law on the basis of

entrapment, Skarie must point to "undisputed evidence making it patently clear that an otherwise innocent person was induced to commit the illegal act" by government agents. *United States v. Hart*, 963 F.2d 1278, 1283 (9th Cir.1992) (quoting *United States v. Smith*, 802 F.2d 1119, 1124 (9th Cir.1986)).

*United States v. Skarie*, 971 F.2d 317, 320 (9th Cir.1992) (emphasis added).

Of course, appellant does not claim that he was entitled to findings of not guilty as a matter of law based on the evidence presented at his court-martial. Instead, he asserts that the judge erred at trial in refusing to instruct the members on the possible defense of entrapment and to submit the question to them for their consideration. *See generally Mathews v. United States*, 485 U.S. at 63, 108 S.Ct. at 886; *United States v. Whoie*, 925 F.2d at 1484–85. We disagree.

The Seventh Circuit has commented on the evidence required to raise the defense of entrapment. It said in *United States v. Gunter*, 741 F.2d at 153:

> Entrapment requires proof that the Government induced defendant to commit the crime and that defendant was not predisposed to commit the crime. *United States v. Russell*, 411 U.S. 423, 93 S.Ct. 1637, 36 L.Ed. 2d 366 (1973); *United States v. Thoma*, 726 F.2d 1191, 1196 (7th Cir.1984); *United States v. Kaminski*, 703 F.2d 1004 (7th Cir.1983). *To raise the defense a defendant must produce evidence of both the Government's inducement and his own lack of predisposition.* Once a defendant accomplishes this, the burden shifts to the Government to prove beyond a reasonable doubt that the defendant was predisposed or that there was no Government inducement. *Thoma*, 726 F.2d at 1196. A defendant may raise the defense by showing that the Government's evidence reveals *some inducement* and *some reluctance* on the part of the defendant. There is no requirement that a defendant testify or produce witnesses. *Id.*

(Emphasis added.) There must be more than a scintilla of evidence. *See United States v. Blevins*, 960 F.2d 1252, 1257 (4th Cir.1992); *United States v. Perl*, 584 F.2d 1316, 1321 (4th Cir.1978), *cert. denied*, 439 U.S. 1130, 99 S.Ct. 1050, 59 L.Ed.2d 92 (1979). This measure of proof is consistent with our case law. *See United States v. Vanzandt*, 14 MJ 332, 343 (CMA 1982); *United States v. Sermons*, 14 MJ 350, 351–52 (CMA 1982). *See generally United States v. Sellers*, 33 MJ 364 (CMA 1991).

Appellant contends that "there was 'some evidence' produced at trial that appellant was induced to participate in the two drug transactions by the government agent." He then simply proceeds to refer us to pages in the record of trial: *i.e.*, 111, 112, 113, 128, 129. Final Brief at 9. These record pages contain testimony from the government agent that he initially approached appellant and Private Cardinale at the bar, focused the conversation on illegal drugs, and arranged with these two strangers to acquire them. He also later testified that he repeated his requests on two occasions after their initial plan for purchasing drugs was not carried out. This is not sufficient evidence of government inducement to warrant an entrapment instruction. *See United States v. Sermons*, 14 MJ at 353.

In *United States v. Stanton*, 973 F.2d 608, 610 (1992), the Court of Appeals for the Eighth Circuit explained the nature of government inducement required for entrapment:

> To establish the first element of entrapment, Stanton had to show government agents induced him to commit the crime. Inducement is government conduct that "creates a substantial risk that an undisposed person or otherwise law-abiding citizen would commit the offense." *United States v. Mendoza–Salgado*, 964 F.2d 993, 1004 (10th Cir.1992) (quoted cases omitted). *Inducement may take different forms, including pressure, assurances that a person is not doing anything wrong, "persuasion, fraudulent representations, threats, coercive tactics, harassment,*

*promises of reward, or pleas based on need, sympathy, or friendship."* Id. (quoted cases omitted); *see Jacobson v. United States,* —— U.S. ——, ——, 112 S.Ct. 1535, 1542–43, 118 L.Ed.2d 174 (1992). Inducement cannot be shown if government agents merely provide the opportunity or facilities to commit the crime or use artifice and stratagem. *Jacobson,* —— U.S. at ——, ——, 112 S.Ct. at 1540, 1541; *Mendoza–Salgado,* 964 F.2d at 1004.

(Emphasis added.)

■ A government agent's repeated requests for assistance in acquiring drugs do not in and of themselves constitute the required inducement. *See United States v. Mendoza–Salgado,* 964 F.2d 993, 1004 (10th Cir.1992); *United States v. Salmon,* 948 F.2d 776, 779 (D.C.Cir.1991); *United States v. Gunter,* 741 F.2d at 153. Moreover, in view of appellant's immediate and repeated agreement to provide drugs, we can discern no other circumstances suggesting overreaching by this government agent or any pressuring by him of appellant to commit these offenses.\* *See United States v. Rodriguez,* 915 F.2d 397, 400 (8th Cir.1990). *See generally United States v. Vanzandt,* 14 MJ at 344.

Appellant also must be able to point to some evidence in the record that he was not predisposed to make the charged drug distribution. On this question, appellate counsel notes evidence that appellant and Private Cardinale missed the first meeting set by the parties to acquire drugs. He also notes that the government agent had to search appellant and Cardinale out in the barracks for their second scheduled meeting. Finally, appellate counsel points to evidence that appellant did not touch the hashish until the sale was over and they were returning to the barracks.

We note, however, that the evidence of record in this case shows that appellant admitted prior drug use and distribution to the undercover agent. It also shows that he enthusiastically participated in the drug-purchase conversation with the agent and supported Private Cardinale in his representations concerning their illicit drug experience. Finally, it shows that he repeatedly agreed to purchase drugs for the agent and passed the money from the agent to Cardinale prior to the actual transaction. In this context, evidence that appellant did not actually touch the drug until after the purchase does not realistically establish or provide even an inference of reluctance on his part to distribute drugs.

The evidence of missed meetings scheduled for the purpose of actually purchasing drugs also did not suggest any lack of predisposition on appellant's part. There was no evidence in this record why appellant and Private Cardinale missed the first meeting on April 13, 1990. *See generally United States v. Perez–Leon,* 757 F.2d 866, 872 (7th Cir.1985); *United States v. Clark,* 28 MJ at 406 (recognizing normal delay factor in drug dealings attributable to "fear of apprehension"). The evidence of record does show, however, why they missed the second meeting on April 14, 1990, *i.e.,* because they did not see the agent at the agreed place and time. This is not evidence of a lack of predisposition to sell drugs but rather evidence of a predisposition of appellant to sell drugs only on his own terms. *See United States v. Sermons,* 14 MJ at 352. Finally, the need for searching out drug dealers does not suggest their lack of predisposition but merely reflects the nature of their illegal enterprise. Accordingly, the defense failed to meet its minimal burden of going forward with evidence raising this defense.

The decision of the United States Army Court of Military Review is affirmed.

Judges COX, CRAWFORD, GIERKE, and WISS concur.

---

\* The evidence of record reveals that the undercover agent testified that appellant and Cardinale stated on the trip to Nuernberg that "they was going to take the portion that I provided them with and smoke it while they were in Nuernberg." According to the agent, "For conducting the transaction, that was their little reward." No one at trial or on appeal has argued that this was evidence of government inducement.