# UNITED STATES AIR FORCE
# COURT OF CRIMINAL APPEALS

———————————

**No. ACM 39073**

———————————

**UNITED STATES**
*Appellee*

**v.**

**Joshua J. DOWD**
Senior Airman (E-4), U.S. Air Force, *Appellant*

———————————

Appeal from the United States Air Force Trial Judiciary

Decided 29 November 2017

———————————

*Military Judge:* Donald R. Eller, Jr.

*Approved sentence:* Dishonorable discharge, confinement for 1 year and 8 months, forfeiture of all pay and allowances, reduction to E-1, and a reprimand. Sentence adjudged 22 January 2016 by GCM convened at Ramstein Air Base, Germany.

*For Appellant:* Major Allen J. Abrams, USAF; Major Mark C. Bruegger, USAF.

*For Appellee:* Major G. Matt Osborn, USAF; Major Mary Ellen Payne, USAF; Major Meredith L. Steer, USAF; Major Matthew L. Tusing, USAF; Gerald R. Bruce, Esquire.

Before MAYBERRY, JOHNSON, and MINK, *Appellate Military Judges*.

Senior Judge JOHNSON delivered the opinion of the court, in which Senior Judge MAYBERRY and Judge MINK joined.

———————————

**This is an unpublished opinion and, as such, does not serve as precedent under AFCCA Rule of Practice and Procedure 18.4.**

———————————

JOHNSON, Senior Judge:

A general court-martial composed of officer and enlisted members convicted Appellant, contrary to his pleas, of two specifications of attempting to commit a lewd act on a child under the age of 16 years in violation of Article 80, Uniform Code of Military Justice (UCMJ), 10 U.S.C. § 880.[1] The court-martial sentenced Appellant to a dishonorable discharge, confinement for one year and eight months, reduction to the grade of E-1, forfeiture of all pay and allowances, and a reprimand. The convening authority approved the sentence as adjudged.

Appellant raises four issues for our consideration on appeal: (1) whether the findings of guilt are incorrect as a matter of law because Appellant was entrapped by the Government; (2) whether the Government violated Appellant's due process rights by failing to disclose information favorable to the Defense; (3) whether the military judge erred by limiting the testimony of Appellant's expert witness;[2] and (4) whether Appellant's sentence was unduly severe. We find no error that materially prejudiced a substantial right of Appellant; accordingly, we affirm the findings and sentence.

## I. BACKGROUND

Appellant was stationed at Ramstein Air Base (AB), Germany, when he responded to a personal advertisement in the "Casual Encounters" section of the Craigslist website on 24 January 2015. The author of the ad purported to be a "younger dependent girl" living on Ramstein AB seeking an "AF man" for "some full time fun." Appellant's response stated: "Would love stone [sic] full time fun. How old are you? I'm 22 but have plenty of experience and know what I'm doing. Let me know some things about you." So began Appellant's correspondence with "Tina," a fictional 14-year-old girl who was created by Special Agent (SA) TK of the Air Force Office of Special Investigations (AFOSI) from his office in Quantico, Virginia, in coordination with the AFOSI detachment at Ramstein AB.

"Tina's" reply informed Appellant that she was 14 years old. Their correspondence by email and text message continued and eventually turned sexual, including comments by Appellant regarding his preferred sexual activities and experience, to include oral sex. In the course of their correspondence, Appellant

---

[1] The court-martial found Appellant not guilty of one specification of attempting to commit a sexual assault on a child under the age of 16 years in violation of Article 80, UCMJ.

[2] Appellant raises this issue pursuant to *United States v. Grostefon*, 12 M.J. 431 (C.M.A. 1982).

also sent "Tina" two photos of his exposed penis and a video of himself masturbating. Appellant made arrangements to meet "Tina" in an apartment on base where she was supposedly housesitting alone. When he arrived at the apartment, Appellant was met and apprehended by AFOSI agents.

Appellant was charged with one specification of attempted sexual assault of a child by penetrating her mouth with his penis, one specification of attempted sexual abuse of a child by communicating indecent language to "Tina," and one specification of sexual abuse of a child by exposing his genitalia to "Tina," all in violation of Article 80, UCMJ.

## II. DISCUSSION

### A. Entrapment

#### 1. Additional Background

The Defense filed a pretrial motion to dismiss the charge and specifications, asserting Appellant had been entrapped by SA TK. The Defense pointed to the following factors in its motion: users of the Craigslist "Casual Encounters" page were required to affirm they were at least 18 years old; the absence of preexisting evidence that Appellant was sexually involved with or attracted to children under the age of 16 years; the photos of "Tina" SA TK sent Appellant, which the Defense asserted portrayed a female who "arguably appear[ed] to be in her 20s"; SA TK's alleged persistence in continuing the dialog; and SA TK's alleged goading of Appellant into bolder responses by having "Tina" comment that Appellant was "boring." In response, citing several military appellate court decisions for comparison, the Government contended SA TK's conduct was not so coercive, outrageous, or shocking to the judicial conscience that Appellant was entitled to prevail as a matter of law.

In a written ruling, the military judge denied the motion to dismiss. He distinguished between the "subjective" test for entrapment, which is normally resolved by the finder of fact at trial, and the "objective" test for entrapment rooted in the Due Process Clause of the Fifth Amendment,[3] which may be decided by a military judge as a matter of law.[4] He found SA TK's behavior was not so outrageous or shocking as to establish entrapment as a matter of law on due process grounds. The military judge acknowledged that, after Appellant's initial contact, "Tina" reinitiated some further electronic conversations, but he

---

[3] U.S. CONST. amend. V.

[4] In argument on the motion, trial defense counsel conceded the military judge should apply the "objective" test to determine whether entrapment existed as a matter of law and, accordingly, the military judge should decide without submitting the issue to the court members.

found no extraordinary pressure or inducement was exerted on Appellant, who was free to discontinue the correspondence at any time.

Nevertheless, at trial the military judge instructed the court members "[t]he evidence has raised the issue of entrapment in relation to all of the offenses alleged," and he provided them further instructions on that defense, without objection. The court members acquitted Appellant of the attempted sexual assault, but convicted him of both specifications of attempted sexual abuse of a child.

**2. Law**

With respect to the affirmative defense of entrapment, Rule for Courts-Martial (R.C.M.) 916(g) states: "It is a defense that the criminal design or suggestion to commit the offense originated in the Government and the accused had no predisposition to commit the offense."

In the usual case, applying what is known as the "subjective" test for entrapment, the defense has the initial burden of showing some evidence that an agent of the Government originated the suggestion to commit the crime. *United States v. Whittle*, 34 M.J. 206, 208 (C.M.A. 1992). Once raised, "the burden then shifts to the Government to prove beyond a reasonable doubt that the criminal design did not originate with the Government or that the accused had a predisposition to commit the offense . . . ." *Id.* (citations omitted). When a person accepts a criminal offer without an extraordinary inducement to do so, he demonstrates a predisposition to commit the crime in question. *Id.*

"Inducement" means more than merely providing the appellant the means or opportunity to commit a crime. *United States v. Howell*, 36 M.J. 354, 358 (C.M.A. 1993). Instead, the Government's conduct must:

> create[ ] a substantial risk that an undisposed person or otherwise law-abiding citizen would commit the offense . . . . Inducement may take different forms, including pressure, assurances that a person is not doing anything wrong, persuasion, fraudulent representations, threats, coercive tactics, harassment, promises of reward, or pleas based on need, sympathy, or friendship.

*Id.* at 359–60 (citations, emphasis, and internal quotation marks omitted). The Government may use undercover agents and informants to ferret out crime and afford opportunities or facilities for criminals to act upon without implicating the defense of entrapment. *Jacobson v. United States*, 503 U.S. 540, 548 (1992); *see also Howell*, 36 M.J. at 358; *Whittle*, 34 M.J. at 208. "Artifice and stratagem may be employed to catch those engaged in criminal enterprises." *Sorrells v. United States*, 287 U.S. 435, 441 (1932); *see also United States v. Russell*, 411 U.S. 423, 435–36 (1973). For example, law enforcement officers

may pretend to be someone other than a Government agent. *See Howell*, 36 M.J. at 358.

In addition to the "subjective" test for entrapment described above, the military courts have recognized an "objective" test whereby a court may find the Government's conduct so outrageous or shocking to the judicial conscience that it violates an accused's right to due process under the Fifth Amendment, and thereby constitutes entrapment as a matter of law. *United States v. Berkhimer*, 72 M.J. 676, 680 (A.F. Ct. Crim. App. 2013); *see United States v. Vanzandt*, 14 M.J. 332, 343 n.11 (C.M.A. 1982). To establish entrapment as a matter of due process, the appellant must show either excessive Government involvement or significant Government coercion in causing the crime to occur under the totality of the circumstances. *Berkhimer*, 72 M.J. at 680. In *Berkhimer* we further explained:

> This is an "extraordinary defense reserved for only the most egregious circumstances" and is not to be invoked every time the government acts in a deceptive manner or participates in a crime it is investigating. . . . To meet the threshold standard of being fundamentally unfair or shocking, the accused must generally show the government acted with coercion, violence or brutality to the person.

*Id.* (citations omitted). "The issue of whether an accused's due process rights were violated is a question of law that this court reviews de novo. . . . When doing so, we give substantial deference to the military judge's findings of fact and will not overturn them unless they are clearly erroneous." *Id.* (citations omitted).

### 3. Analysis

On appeal, both parties quote *Vanzandt* for the proposition that "[s]ince the trier of fact found against him on the entrapment issue, [A]ppellant can only prevail by showing that these findings are incorrect as a matter of law." 14 M.J. at 345. In *Vanzandt*, our superior court found no "outrageous police behavior" that would require reversal "on due process grounds," implying an application of the objective, constitutional test for entrapment. *Id.* Before us, Appellant explicitly urges "Appellant was entrapped as a matter of law." Therefore, we begin our analysis by applying the objective test. Under that standard, Appellant must demonstrate "fundamentally unfair or shocking" police behavior in order to prevail. *Berkhimer*, 72 M.J. at 680.

We are not persuaded. At the outset of their correspondence, "Tina" informed Appellant that she was only 14 years old. Despite this, Appellant willingly sent "Tina" messages describing his enjoyment of oral sex and rough sex, offering to "teach" her about sex, referring to his penis size, and indicating that

he wanted to look at pictures of her while masturbating. In addition, he sent "Tina" two unrequested photos of his penis and a video of himself masturbating. The record indicates he did so not because he was coerced or fearful, but in order to gratify his sexual desires. The fact that "Tina's" Craigslist advertisement and many of her messages were arguably titillating, that "Tina" re-initiated the text conversation at certain points, and that "she" called Appellant "boring" did not coerce Appellant's behavior, and it fails to outrage or shock the judicial conscience to the point of establishing a due process violation.

Yet we do not end our inquiry there. Unlike the military judge in ruling on the Defense's pretrial motion to dismiss, and unlike our superior court, we are not limited to questions of law. *See United States v. Parker*, 36 M.J. 269, 271 (C.M.A. 1993) (noting military service courts "are something like the proverbial 800-pound gorilla when it comes to their ability to protect an accused"). We recognize our "awesome, plenary, *de novo* power" of review, *United States v. Cole*, 31 M.J. 270, 272 (C.M.A. 1990), and our charge under Article 66(c), UCMJ, to "affirm only such findings of guilty . . . as [we] find[ ] correct in law and fact and determine[ ], on the basis of the entire record, should be approved." 10 U.S.C. § 866(c). Article 66(c) requires we conduct "a *de novo* review of the legal and factual sufficiency of the case." *United States v. Washington*, 57 M.J. 394, 399 (C.A.A.F. 2002). Where, as the military judge found here, the evidence before the court-martial raises the issue of entrapment, at trial the burden shifts to the Government to prove the absence of entrapment beyond a reasonable doubt under the subjective test described above. If the Government cannot do so, the accused should be acquitted. In other words, the absence of entrapment essentially becomes part of the case the Government must prove beyond a reasonable doubt in order to secure a conviction. Accordingly, we now also review Appellant's entrapment claim under the subjective standard.

The initial question under this standard is whether there is *some* evidence the suggestion to commit the crime originated with an agent of the Government. *Whittle*, 34 M.J. at 208. "There must be more than a scintilla" of such evidence. *Howell*, 36 M.J. at 359. By way of comparison, our superior court has found that repeated requests by a Government agent to purchase illegal drugs through an accused is not sufficient evidence of Government origination to warrant an entrapment instruction. *Id.* But we recognize the military judge found a sufficient basis to instruct the court members on the affirmative defense in this case. For purposes of our analysis we assume, without deciding, the burden shifted to the Government.

Nevertheless, we are satisfied beyond a reasonable doubt Appellant was not entrapped. An accused who commits an offense without an extraordinary inducement from a Government agent to do so demonstrates a predisposition

to commit the offense, and is not the victim of entrapment. *Whittle*, 34 M.J. at 208. "Extraordinary inducement" requires more than simply being presented with the opportunity to commit the crime. *Id.* In this case, SA TK through "Tina" merely created the opportunity to commit the offense. Appellant chose to respond to the advertisement and to continue the correspondence after being told "Tina" was only 14. Appellant initiated the sexual conversation, and chose to send "Tina" photos and a video of his penis. "Tina" did not initiate sexually explicit conversations, nor did she request any sexually explicit images, nor did she coerce or threaten Appellant into any course of action. We are not persuaded that a 14-year-old girl calling a 22-year-old man "boring" in a text message is an extraordinary inducement to commit a lewd act with a child under the circumstances of this case.

The Government's conduct did not create a substantial risk that an undisposed person or otherwise law-abiding citizen would commit these crimes. Appellant, by his actions, demonstrated his predisposition to commit the underlying offenses. Therefore, he was not entrapped.

## B. Discovery

### 1. Additional Background

Appellant's trial concluded on 22 January 2016. In April 2016, SA TK testified in another court-martial at Ramstein AB featuring "Tina," *United States v. Smith*.[5] During that trial, SA TK was cross-examined regarding the operations plan that was submitted to AFOSI leadership to authorize the "Tina" operations, known generally as "Operation Artemis." SA TK testified that he participated in creating the operations plan, which included as an attachment an "OSI Form 4," a checklist for conducting undercover operations. SA TK further testified the Artemis plan required approval by a GS-15 civilian director as well as the general officer AFOSI commander. Then the following colloquy occurred:

> Q. [Civilian Defense Counsel] [SA TK], please take a look at this document. This is the Artemis that we discussed with attachment one, the OSI Form 4, correct?
>
> A. [SA TK] Yes, sir.
>
> Q. This is the operational plan that was used and authorized, as you say, with regard to this Tina operation, correct?
>
> A. Yes, sir.

---

[5] Appellant's civilian trial defense counsel, Mr. AC, was also Smith's civilian trial defense counsel.

Q. There is no other are [sic] Artemis, no other operation plan approved by the general, correct?

A. No, sir.

Q. Because the general didn't approve the Tina operation, you would agree it's an unreliable investigation, correct?

A. Yes, sir.

Q. An unauthorized investigation? The general didn't approve the Tina investigation, correct?

A. Yes, sir.

Q. The very reliability of the case against Senior Airman Smith, in your mind, would be called into substantial question if this operation were not authorized, correct?

A. Yes, sir.

As SA TK's testimony continued, he acknowledged the checklist attached to the operations plan, the OSI Form 4, indicated that SA TK as the undercover agent would portray "a military husband with kids," a form of the operation known as "Plan A," but did not reference SA TK portraying an underage girl, known as "Plan B." However, SA TK clarified that the operations plan itself, as distinguished from the attachment, authorized both Plan A and Plan B activities, and that the general had in fact "signed off on the ops plan." The OSI Form 4 was an administrative checklist merely to be used as a guide; the operations plan itself was the "standard" of the operation. The copy of the operations plan attached to the *Smith* record of trial as an appellate exhibit indicates the AFOSI commander signed and approved the Artemis plan in late October 2014, over two months before Appellant responded to "Tina's" Craigslist ad in the instant case. The Artemis plan authorized a six-month operation.

The cross-examination of SA TK in *Smith* later focused on a week-long training course on conducting undercover operations such as the "Tina" operation that SA TK had attended. SA TK indicated that prior to *Smith* and to other trials based on "Tina" operations, trial counsel had asked him whether he had a "training guide or syllabus" from that course, and SA TK had informed them he did not. However, he testified he did have "slides" from the course, and had told trial counsel so. SA TK testified it was his understanding that "slides" as distinguished from a "training guide or syllabus" had never been requested. These slides address the subject of entrapment, among other topics. SA TK further testified trial defense counsel in *Smith* became aware of the existence of these slides when they asked SA TK about slides in a pretrial interview. During the interview, SA TK also told the *Smith* trial defense counsel he believed he had previously provided the slides to trial counsel.

8

Turning to the substance of the training, SA TK acknowledged the slides used during the first three days of the course do not specifically include examples of Plan B-type operations. However, he testified the "hands-on" portion of the course during the final two days did include specific training on Plan B scenarios. SA TK denied that the "Tina" operation he conducted in *Smith* deviated from his training or from the Artemis operations plan.

Captain (Capt) AS, the then-Deputy Chief of Military Justice at Ramstein AB, also testified in *Smith*. Capt AS had served as a trial counsel in three prior trials featuring "Tina" in which SA TK had testified, including Appellant's; he was not a trial counsel in *Smith*. Capt AS testified that prior to the first of these trials in October 2015, the trial defense counsel (who did not include Appellant's trial defense counsel) had requested any training materials related to entrapment that SA TK may have from the course he attended. Capt AS testified he relayed the request to SA TK in Quantico, Virginia, specifically including "slides" as materials that were requested. According to Capt AS, SA TK's response was that the instructor had no training materials from the course, and SA TK did not provide any slides or other training material. Capt AS testified he did not receive requests for such training materials in the other two trials in which he served as trial counsel—although not referenced by name, this would have included Appellant's trial.

Appellant's civilian defense counsel, Mr. AC, has provided a sworn declaration that at the time he was preparing for Appellant's trial, his understanding from communicating with other defense counsel involved in prior courts-martial involving SA TK was that there were no entrapment training materials. As a result, the Defense did not specifically request SA TK's training materials in its written discovery requests prior to Appellant's trial. Mr. AC represented Smith as well as Appellant. Although Mr. AC specifically asked SA TK about training materials in pretrial interviews before Smith's court-martial, he "cannot specifically recall" doing so in Appellant's case. Mr. AC avers that disclosure of these materials in appellant's case would have enabled him to demonstrate that SA TK deviated from his training, and that his training deviated from other investigative agencies' operating procedures in such cases. He believes it may also have impacted the matters the Defense expert, Dr. MD, was permitted to testify to (addressed below), but he does not specify how. Finally, he contends that prior to Appellant's trial he was unaware SA TK's "Tina" operation was "unauthorized," which SA TK agreed made it an "unreliable" investigation.

Appellant's military defense counsel, Major (Maj) BP, also provided a sworn declaration. Maj BP echoes Mr. AC's assertion that Appellant's defense team learned from other defense counsel that the Government had previously denied the existence of entrapment training materials, and therefore the Defense did

not issue a specific discovery request for such materials prior to Appellant's trial. Like Mr. AC, Maj BP does not presently recall orally requesting entrapment training materials prior to Appellant's trial. However, he believes the Defense *did* orally request such materials based on representations he previously made in the clemency submission to the convening authority after Appellant's trial. His clemency memorandum, dated 24 April 2016, includes the following assertion:

> During interviews for this court-martial and prior associated cases, Defense Counsels have consistently requested SA [TK] and prosecutors produce training materials which were utilized in the training of SA [TK] and other special agents . . . . Despite existence of a training slide deck of 86 slides being in the position [sic] of AFOSI, SA [TK] failed to identify such existence to the Defense prior to the conclusion of *US v SrA Dowd*.

Like Mr. AC, Maj BP did not recall receiving any information regarding SA TK's "Tina" operation being "unauthorized." He contends the training materials and information regarding the "unauthorized" nature of the operation "would have been useful for cross-examination purposes" and "may have made a material difference . . . regarding the matters to which Dr. [MD] was permitted to testify."

### 2. Law

"[T]he suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Brady v. Maryland*, 373 U.S. 83, 87 (1963). The United States Supreme Court has extended *Brady*, clarifying "that the duty to disclose such evidence is applicable even though there has been no request by the accused . . . and that the duty encompasses impeachment evidence as well as exculpatory evidence." *Strickler v. Greene*, 527 U.S. 263, 280 (1999); *see United States v. Claxton*, 76 M.J. 356, 359 (C.A.A.F. 2017).

"A military accused also has the right to obtain favorable evidence under Article 46, UCMJ . . . as implemented by R.C.M. 701–03." *United States v. Coleman*, 72 M.J. 184, 186–87 (C.A.A.F. 2013). Article 46 and these implementing rules provide a military accused statutory discovery rights that are greater than those afforded by the Constitution. *See id.* at 187; *United States v. Roberts*, 59 M.J. 323, 327 (C.A.A.F. 2004). In particular, R.C.M. 701(a)(2)(A) requires the Government, upon defense request, to permit the inspection of, *inter alia*, any documents "within the possession, custody, or control of military authorities, and which are material to the preparation of the defense . . . ." Infor-

mation which is relevant to a witness's credibility may be "material to the preparation of the defense" for purposes of R.C.M. 701(a)(2)(A). *Roberts*, 59 M.J. 323, 326 (C.A.A.F. 2004).

Consequently, there are two categories of disclosure error: (1) cases in which the defense made no discovery request or merely a general request for discovery; and, (2) cases in which the defense specifically requested the information. *Coleman*, 72 M.J. at 187 (citing *Roberts*, 59 M.J. at 326–27). The harmless error standard of review—"whether there is a reasonable probability that, had the evidence been disclosed, the result of the proceeding would have been different"—applies to the first category. *Id.* (quoting *Smith v. Cain*, 565 U.S. 73, 75 (2012)) (internal quotation marks omitted). The heightened constitutional harmless beyond a reasonable doubt standard applies to the second category. *Id.* "Failing to disclose requested material favorable to the defense is not harmless beyond a reasonable doubt if the undisclosed evidence might have affected the outcome of the trial." *Id.*

In reviewing discovery matters, we conduct the following two-step analysis: "first, we determine whether the information or evidence at issue was subject to disclosure or discovery; second, if there was nondisclosure of such information, we test the effect of that nondisclosure on [Appellant's] trial." *Id.* (quoting *Roberts*, 59 M.J. at 325) (internal quotation marks omitted).

**3. Analysis**

Appellant contends the Government violated his right to discovery in two respects. First, Appellant asserts the Government failed to disclose SA TK's training slides in response to a specific request for such materials. Second, Appellant avers the Government failed to disclose the "unauthorized" nature of the "Tina" operation, and was required to do so because it was *Brady* material and also responsive to the Defense's discovery request for information regarding witness bias. Accordingly, Appellant concludes this court should set aside the findings and sentence. We disagree.

**a. Subject to Discovery**

We begin by considering whether either of these pieces of information were required to be disclosed to the Defense in this case. *See Coleman*, 72 M.J. at 187. We conclude they were not.

With respect to the training slides, Appellant does not contend they are *Brady* material but rather argues they were specifically requested and material to the preparation of the defense, and therefore subject to R.C.M. 701(a)(2)(A). We are not persuaded. Both Mr. AC and Maj BP indicate they did not submit a specific written discovery request for such material. Neither can recall orally requesting such material prior to Appellant's trial. Capt AS's tes-

timony at Smith's trial confirms there was no such discovery request in Appellant's case. Apparently, when Mr. AC did later inquire about such material in a pretrial interview before Smith's court-martial, SA TK informed him of the existence of the slides. We perceive no apparent reason why SA TK would have disclosed this information in *Smith* but withheld it in Appellant's case if he had been asked the same questions. Similarly, in Mr. AC's extensive cross-examination of SA TK during Smith's trial there is no reference to SA TK having previously misled the trial defense counsel in pretrial interviews before Appellant's trial.

It is true that Maj BP's clemency submission to the convening authority in Appellant's case conveys the impression the Defense requested the training materials in "this court-martial and prior associated cases." However, counsel's zealous advocacy for relief on behalf of his client, hard on the heels of the disclosure of the slides in Smith's court-martial, is a very slender reed on which to find such a request in the absence of any other evidence of it.

It is also true the testimony of SA TK and Capt AS in *Smith* suggest an actual discovery request for training material may not have been properly handled in a different court-martial held in October 2014. However, that was not this case. That Appellant's trial defense counsel may have received misleading information through other defense counsel does not change the absence of a discovery request in this case.

With respect to the "unauthorized" nature of the operation, Appellant contends this was incorporated by his request for *Brady* material and information regarding witness bias. Again, we are not persuaded. Appellant points to the OSI Form 4 checklist attached to the operations plan, which described a "Plan A" operation but not a "Plan B" operation such as that employed in Appellant's case. However, the Artemis operations plan itself, as SA TK explained in his testimony in *Smith*, clearly authorized both types of operations.

Appellant also points to the portion of SA TK's testimony in *Smith* where he appeared to agree the AFOSI commanding general "didn't approve the Tina operation" and therefore "it's an unreliable investigation." This testimony is puzzling and difficult to square with SA TK's subsequent testimony in the same case that the AFOSI commander did authorize the Artemis operations plan, and with the copy of the plan attached to the record, which indicated the general signed and approved it. It is possible SA TK was confused by the question; or believed the civilian defense counsel was presenting a hypothetical situation; or was drawing a distinction between the umbrella Artemis plan for "Tina"-type operations, which the commander did sign, and the specific "Tina" operation involving Appellant, which the commander did not separately authorize. It is possible the manner in which the questions were spoken influ-

enced the response in some way not apparent in the transcript. It is also possible SA TK simply misspoke, and subsequently clarified his testimony. In any event, considering the record as a whole, we are not persuaded that SA TK believed the operation was unauthorized, that the operation was in fact unauthorized, or that the prosecution had a duty report it as such, either under *Brady* or in response to a general discovery request under R.C.M. 701.

### b. Effect of Nondisclosure

Assuming *arguendo* that the training slides and the "unauthorized" nature of the "Tina" operation in Appellant's case should have been disclosed, we next consider the effect of the nondisclosure on Appellant's trial. Because we have found there was no specific discovery request for either piece of information, it follows that we would apply the harmless error test: whether there is a reasonable probability disclosure would have led to a different result. However, even if we applied the heightened standard of harmlessness beyond a reasonable doubt, we would still find no relief warranted. *See id.*

Disclosure of the training slides would not have impacted the trial in any significant way. The critical evidence in this case was not SA TK's testimony per se, but the electronic record of Appellant's communications with "Tina." SA TK's direct testimony in Appellant's trial was largely focused on explaining what the transcripts of those exchanges were and how they came about. The Defense did not challenge the authenticity of those transcripts. Nothing in the proposed cross-examination of SA TK based on the training slides would have changed the ad Appellant responded to, the messages he received from "Tina," or the indecent language or images of his penis that Appellant intentionally transmitted to someone he believed to be a 14-year-old child.

As for the "unauthorized" operation, as described above, the record in *Smith* indicates it was not unauthorized as Appellant insists. Whether SA TK would have provided similarly puzzling testimony on cross-examination in Appellant's case as he did in *Smith* is speculative. Even if he had initially done so, presumably he would have clarified that the AFOSI commander in fact approved the plan, and that it did authorize "Plan B," "Tina"-type operations, just as he did in *Smith*.

Accordingly, we find the nondisclosures, even if they had been erroneous, were harmless beyond a reasonable doubt.

## C. Expert Testimony

### 1. Law

A military judge's decision to admit or exclude expert testimony is reviewed for an abuse of discretion. *United States v. Ellis*, 68 M.J. 341, 344 (C.A.A.F. 2010). "A military judge abuses his discretion when: (1) the findings of fact

upon which he predicates his ruling are not supported by the evidence of record; (2) if incorrect legal principles were used; or (3) if his application of the correct legal principles to the facts [was] clearly unreasonable." *Id.* (quoting *United States v. Mackie*, 66 M.J. 198, 199 (C.A.A.F. 2008)).

Military Rule of Evidence (Mil. R. Evid.) 702 governs the testimony of expert witnesses in a trial by court-martial. The Rule provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

The United States Court of Appeals for the Armed Forces (CAAF) has articulated six factors for military courts to analyze to determine whether a proponent of expert testimony has met the Mil. R. Evid. 702 criteria: "(1) the qualifications of the expert; (2) the subject matter of the expert testimony; (3) the basis for the expert testimony; (4) the legal relevance of the evidence; (5) the reliability of the evidence; and (6) that the probative value of the expert's testimony outweighs the other considerations outlined in [Mil. R. Evid.] 403."[6] *United States v. Billings*, 61 M.J. 163, 166 (C.A.A.F. 2005) (citing *United States v. Houser*, 36 M.J. 392, 397 (C.M.A. 1993)). Though *Houser* predates the leading United States Supreme Court decisions in this area, *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), and *Kumho Tire Co. v. Carmichael*, 526 U.S. 137 (1999), *Houser* is consistent with these decisions and continues to guide the admission of expert testimony in courts-martial. *Billings*, 61 M.J. at 166.

However, "while satisfying every *Daubert* or *Houser* factor is sufficient, it is not necessary." *United States v. Sanchez*, 65 M.J. 145, 149 (C.A.A.F. 2007). The military judge's inquiry is flexible and tied to the facts of the particular case. *Id.* (citing *Kumho Tire Co.*, 526 U.S. at 150).

---

[6] Mil. R. Evid. 403 provides "[t]he military judge may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the members, undue delay, wasting time, or needlessly presenting cumulative evidence."

**2. Additional Background**

After the Government rested its case for findings, the Defense sought to introduce the expert testimony of Dr. MD, a civilian psychologist who served as their expert consultant. The Government advised the military judge it would object on various grounds. The military judge conducted a hearing outside the presence of the court members during which he received testimony from Dr. MD and argument from counsel. The military judge also considered Dr. MD's *curriculum vitae* and the areas of proposed testimony as set forth in a 25-slide presentation the Defense intended to use during her testimony.

Dr. MD testified on direct examination that she was a developmental psychologist and an associate professor of psychology who divided her time between teaching and research. After detailing her educational background, she testified she began specializing in language and technology in 2008, and published her first article on sexting in 2011. She had testified previously in a court-martial as an expert in psychology, technology, and sexuality. She had also testified in a civil case as an expert in sexting. Dr. MD had not spoken with Appellant; her knowledge of the case was based on a review of text messages and emails between Appellant and "Tina." Much of the data that she and other researchers rely on comes from university students, but she was comfortable generalizing the data to all young adults. Trial defense counsel proposed to have Dr. MD recognized as an expert in the fields of psychology, technology and sexuality; sexting; and sexting and relationships.

Under questioning by trial counsel, Dr. MD testified she was neither a clinical psychologist nor a forensic psychologist. She did not typically apply her methodologies in trials or criminal settings. Her research did not focus on military members or minors. She had "no idea" if the type of information she worked with in the field of psychology and technology was used by practitioners in other fields of psychology. Her research generally involved participants who responded based on actual sexual relationships they had engaged in. The military judge stated he would accept Dr. MD's "qualifications solely for the purposes of this hearing in order to figure out what these mean, psychology/technology/sexuality/sexting/relationships."

Trial defense counsel then resumed questioning to develop the substance of Dr. MD's proposed testimony regarding Appellant's case. Dr. MD described two different tools used to measure coercion or control in relationships: the Sexual Coercion in Intimate Relationships Scale (SCIRS) and the Controlling Behaviors Scale, Revised (CBS-R). Dr. MD explained the SCIRS is a scale that measures sexual coercion by reference to "physical acts, threats, . . . hints of violence, hints of taking away resources. . . . all sorts of subtle tactics." The CBS-R identifies particular tactics of emotional control and other controlling behavior in a relationship, such as "calling someone unpleasant names" and

"threats to leave the relationship." According to Dr. MD, applying the SCIRS and CBS-R to the correspondence in this case evinced "Tina" employed coercive or controlling behavior toward Appellant in the form of persistence by repeatedly reinitiating the conversation, threats to self-esteem by calling Appellant "boring," and threats to leave the "relationship" by at one point writing "ok well whatevs was nice meetin u" [sic].

Dr. MD then described a third tool she used to analyze the Appellant and "Tina's" interaction, the Linguistic Inquiry and Word Count (LIWC). She explained the "LIWC is a software program that takes a text and places the words that are in [the LIWC's] dictionary [of 6400 words] into meaningful categories." The LIWC has existed since the 1990s and has been used in "hundreds" of peer-reviewed articles. Dr. MD applied the LIWC to the text message transcript between Appellant and "Tina" to measure the "domains" of "positive emotion," "analytic thinking," and "clout" on a scale of 0 to 100. Dr. MD explained "[c]lout refers to your social status in the conversation or leadership that it displays through either speaking or writing." The result of her analysis was that both Appellant and "Tina" exhibited positive emotion, but that "Tina's" messages exhibited higher scores in analytic reasoning and clout. However, Dr. MD added that she had "no frame of reference to provide the jury members with regard to the magnitude of these differences and what they mean from a practical sense."

Dr. MD summarized her conclusions as follows:

> I would say clinically that I can see in the chat transcripts there is evidence of coercion, as it's been defined in the relational literature. There is evidence of control as it's been defined in the relational literature and there has been evidence of psychological aggression as it is evidenced in the literature by [SA TK].
>
> . . .
>
> I also just want to say one more thing, which is [Appellant], the reactions that he had each time were very consistent, and they are consistent with a compensatory response as well, so that is something that I think needs to be considered.

On cross-examination, Dr. MD reiterated that the research she relied on generally drew on adults reporting on committed intimate relationships, and did not involve children. She also acknowledged portions of her analysis required subjective interpretation on her part. She also agreed the creators of the LIWC described it as, "like all text analysis tools . . . a relatively crude instrument" that "makes many errors in identifying and counting individual words." Moreover, she agreed the LIWC does not understand irony, sarcasm,

metaphor, or innuendo, nor does it recognize misspelled words. She edited portions of the text messages in order to make them comprehensible to the LIWC. Dr. MD further agreed that her research normally involved transcripts that were substantially longer, and therefore more reliable, than the texts involved in this case.

In response to questioning by the military judge, Dr. MD stated her LIWC analysis was based only on the text message transcript and did not include the email transcript. She testified she was unaware of the LIWC, a research tool, being used as evidence in any federal, state, or military trial. She was also unaware of any research that applied the SCIRS, CBS-R, or LIWC to a situation involving a 22-year-old man engaging what he believes to be a 14-year-old girl in conversation over the internet, although she felt comfortable generalizing the research she knew of to that situation.

After receiving arguments from counsel, the military judge issued an oral ruling that Dr. MD would not be allowed to give the proffered testimony, which he subsequently supplemented in a written ruling. The military judge made extensive findings of fact, including adopting as fact the substance of Dr. MD's hearing testimony. However, applying the *Houser* factors, the military judge found the Defense had failed to carry its burden to compel the proffered testimony.

Although the military judge found Dr. MD had expertise in the areas of psychology, technology and sexuality, he found "little if any legal relevance to the testimony." With respect to her SCIRS and CBS-R analysis, the military judge found Dr. MD's "application of undefined terms does nothing to help the members assess the naturally, easily interpreted conversations between 'Tina' and [Appellant]." He continued:

> As to the LIWC analysis, this is also of no import in large part because the context of the conversations in this case is an assessment of a discussion between [Appellant] and who he believed to be a 14-year-old girl. The relative positions of the parties does nothing to assist the members in assessing whether [Appellant] conveyed the words captured in the messages, if he had the requisite intent to gratify his sexual desires by words spoken, or if [Appellant] was entrapped.

Furthermore, he found Dr. MD's testimony regarding Appellant's motivations to be speculative and "wholly improper in light of the evidence presented. As opposed to cases in which a psychologist can help to explain evidence which might be perceived to be counter-intuitive, Dr. [MD's] testimony does no more than create baseless speculation as to [Appellant's] thoughts and beliefs."

The military judge also found the proffered testimony unreliable as applied to Appellant's case. With respect to Dr. MD's SCIRS and CBS-R analysis, he found "the lack of any defined terms appears to result in her analysis being untestable and not subject to any objective assessment or challenge." In addition, Dr. MD did not provide any research or explanation for applying the research data she relied on to a case involving exclusively electronic communications between a 22-year-old man and a 14-year-old girl. With respect to the LIWC analysis, Dr. MD did not testify to any quantifiable error rate or adequate indicia of reliability. He also noted "she testified that LIWC has never been applied in a criminal setting, and it was her belief that forensic psychologists were unaware of the tool even after more than 25 years in existence . . . which may also shed light on the program's reliability and usefulness in a criminal setting." Further, he found Dr. MD's "intended application of the general psychological notions of belongingness and motivation is nothing more than speculation."

Finally, the military judge found "the incredibly limited probative value of Dr. [MD's] testimony is substantially outweighed by the danger of confusion, prejudice and potential waste of time." Accordingly, the military judge granted the Government motion to exclude the proffered testimony. However, upon a Defense motion for reconsideration, the military judge permitted Dr. MD to be qualified as an expert in the field of psychology and "to testify generally about psychological issues applicable to all people related to the desires of humans to belong to a group, to engage in relationships, as well as their motivations to act in these settings."

Before the members, Dr. MD did testify as an expert in psychology. She described the fundamental human needs to belong and for self-esteem; she testified that insults or rejection can threaten these needs; she explained that humans who feel their self-esteem threatened may respond with compensatory behavior intended to display a perceived strength; and she testified that such threats may also impair one's self-control and lead to riskier behaviors. Dr. MD did not testify regarding any specific aspect of Appellant's case.

**3. Analysis**

We find no abuse of discretion by the military judge. His findings of fact generally set forth the procedural history of the case, the record of email and text correspondence between Appellant and "Tina," and Dr. MD's hearing testimony, and was not clearly erroneous. He applied the appropriate six-factor analysis for admissibility of expert testimony the CAAF set forth in *Houser*. Furthermore, his application of the *Houser* factors to Dr. MD's proffered testimony was not "clearly unreasonable." *Ellis*, 68 M.J. at 344.

The record supports the military judge's conclusion that the proffered testimony had little relevance to the court-martial. The correspondence between Appellant and "Tina" could be easily understood by the court members or any lay person. Dr. MD's subjective analysis applying terms such as "coercion" and "aggression" drawn from a specific academic context of psychological research would be of minimal assistance to the members in following the military judge's instructions. Dr. MD agreed the LIWC analysis, an automated process of sorting words in a transcript into categories, was a "relatively crude instrument" that generated numerical scores whose relative significance in this case she could not explain "from a practical sense."

The record also indicates the reliability of Dr. MD's analysis was highly questionable in the context of Appellant's trial. Her testimony largely drew on surveys of adults in committed sexual relationships of substantial duration. Dr. MD was unaware of any research involving the circumstances of this case, i.e., a solely electronic correspondence between a 22-year-old man and a purported 14-year-old girl who had never met, much less formed an intimate relationship. She did not explain how her subjective application of SCIRS or CBS-R indicators might be objectively tested for accuracy. Moreover, with respect to the LIWC, Dr. MD was unaware of it ever having been employed in a criminal trial and doubted forensic psychologists were even aware of the existence of this research tool. In addition, Dr. MD overlaid a layer of subjectivity onto this "crude instrument" by limiting her analysis to the text messages rather than email and by editing portions of the transcript to make in more comprehensible to the software.

Finally, the record further indicates the slight evidentiary value of the proffered testimony is substantially outweighed by the dangers of confusion, unfair prejudice, and waste of time. Again, the correspondence between Appellant and "Tina" was readily understandable to the court members. Injecting Dr. MD's subjective coercion analysis based on surveys of questionable applicability or the LIWC results that were not designed for forensic use would have invited unnecessary and unhelpful confusion and delay.

Based on the record, we cannot say the military judge's ruling was "a clear error of judgment" or "manifestly erroneous." *Sanchez*, 65 M.J. at 148 (citation omitted).

## D. Sentence Appropriateness

We review issues of sentence appropriateness de novo. *United States v. Lane*, 64 M.J. 1, 2 (C.A.A.F. 2006) (citing *Cole*, 31 M.J. at 272). We may affirm only as much of the sentence as we find correct in law and fact and determine should be approved on the basis of the entire record. Article 66(c), UCMJ. "We assess sentence appropriateness by considering the particular appellant, the

nature and seriousness of the offense[s], the appellant's record of service, and all matters contained in the record of trial." *United States v. Sauk*, 74 M.J. 594, 606 (A.F. Ct. Crim. App. 2015) (citing *United States v. Anderson*, 67 M.J. 703, 705 (A.F. Ct. Crim. App. 2009)). Although we have great discretion to determine whether a sentence is appropriate, we have no power to grant mercy. *United States v. Nerad*, 69 M.J. 138, 146 (C.A.A.F. 2010).

Appellant rests his argument on a comparison of his sentence with the sentences of three other Airmen convicted of similar offenses of attempted sexual abuse of a child resulting from AFOSI operations featuring "Tina." Appellant notes that in each of these other cases the accused received a shorter term of confinement than the 20 months he received, ranging between 4 and 12 months. Therefore, Appellant contends, his sentence was highly disparate and unduly severe, and this court should grant unspecified appropriate sentence relief. We disagree.

In requesting us to compare his sentence with those of other accuseds, Appellant bears the burden of demonstrating these cases are "closely related" to his and, if so, that the sentences are "highly disparate." *United States v. Lacy*, 50 M.J. 286, 288 (C.A.A.F. 1999). The CAAF has indicated cases are "closely related" if there is a "direct nexus between the servicemembers to be compared," for example, involvement in a common crime or in parallel schemes. *Id.* If Appellant carries that burden, then the Government must show a rational basis for the differences. *Id.* We recognize that under Article 66(c) we may, in determining whether a sentence is appropriate, consider the outcomes of other non-closely-related courts-martial even though we are not required to do so. *See United States v. Wacha*, 55 M.J. 266, 267 (C.A.A.F. 2001). However, unless the cases *are* closely related, "[t]he appropriateness of a sentence generally should be determined without reference or comparison to sentences in other cases." *United States v. LeBlanc*, 74 M.J. 650, 659 (A.F. Ct. Crim. App. 2015) (en banc) (citing *United States v. Ballard*, 20 M.J. 282, 283 (C.M.A. 1985)).

We do not find the cases Appellant cites to be "closely related" to his own, as the CAAF has explained and we have interpreted that term. *See, e.g., id.* Nothing in the record indicates Appellant was aware of any of these other Airmen, much less that he was involved in a common crime or parallel scheme with them. Although these other cases may have involved SA TK and "Tina," that does not establish a "direct nexus" between the servicemembers themselves. *See Lacy*, 50 M.J. at 288. Each case may have involved similar offenses, but each also involved a unique specific course of criminal conduct between the accused and "Tina," in addition to the unique service records, other specific

aggravating, mitigating or extenuating circumstances, and individual characteristics of the Airmen involved. Therefore, we decline to compare Appellant's sentence with those of other, unaffiliated offenders.

Turning to the particulars of the case before us, we have given individualized consideration to Appellant, the nature and seriousness of the offenses, Appellant's record of service, and all other matters contained in the record of trial. The court members found Appellant guilty of two specifications of attempted sexual abuse of a child. That "Tina," unbeknownst to Appellant, did not actually exist obviously limits the victim impact, but hardly lessens his culpability. Appellant faced a maximum sentence of 30 years in confinement, a dishonorable discharge, total forfeiture of all pay and allowances, and reduction to the grade of E-1. The 20 months in confinement he received represents less than six percent of the maximum possible term. We conclude the sentence is not inappropriately severe based on the facts and circumstances of this particular case.

## III. CONCLUSION

The approved findings and sentence are correct in law and fact and no error materially prejudicial to the substantial rights of Appellant occurred. Articles 59(a) and 66(c), UCMJ, 10 U.S.C. §§ 859(a), 866(c). Accordingly, the findings and sentence are **AFFIRMED**.

FOR THE COURT

KATHLEEN M. POTTER
Acting Clerk of the Court