*This opinion is subject to administrative correction before final disposition.*

# United States Navy–Marine Corps
# Court of Criminal Appeals

Before
CRISFIELD, STEPHENS, and LAWRENCE
Appellate Military Judges

_____

**UNITED STATES**
Appellee

**v.**

**William J. SCOTT**
Staff Sergeant (E-6), U.S. Marine Corps
Appellant

**No. 201900076**

Decided: 31 August 2020

Appeal from the United States Navy-Marine Corps Trial Judiciary

Military Judges:
Stephen C. Reyes (arraignment and motion)
Mark D. Sameit (motions and trial)

Sentence adjudged 16 November 2018 by a general court-martial convened at Camp Foster, Okinawa, Japan, consisting of officer and enlisted members. Sentence in the Entry of Judgment: confinement for 18 months, forfeiture of $1,638.00 per month for 18 months, reduction to E-1, and a dishonorable discharge.

For Appellant:
*Mr. William E. Cassara, Esq.*
*Lieutenant Michael W. Wester, JAGC, USN*

For Appellee:
*Major Kyle D. Meeder, USMC*
*Mr. Brian K. Keller, Esq.*

_____

**This opinion does not serve as binding precedent but
may be cited as persuasive authority under
NMCCA Rule of Appellate Procedure 30.2.**

———————————————

STEPHENS, Senior Judge:

Appellant was convicted, contrary to his pleas, of two specifications of attempted sexual assault of a child and one specification of attempted sexual abuse of a child, in violation of Article 80, Uniform Code of Military Justice [UCMJ].[1] The military judge merged the two specifications of attempted sexual assault of a child for findings and sentencing.

Appellant asserts four assignments of error [AOEs], which we have renumbered: (1) the evidence is not factually sufficient because the Government did not prove beyond a reasonable doubt that Appellant was not entrapped; (2) Appellant received ineffective assistance from his trial defense counsel [TDC]—his civilian lead defense counsel, Mr. Charlie;[2] and his detailed military defense counsel, Captain [Capt] Lima—and his substitute post-trial military counsel, Capt Oscar; (3) Capt Lima was improperly excused at trial; and (4) the charges of which he was convicted were unreasonably multiplied. We find no prejudicial error and affirm.[3]

## I. BACKGROUND

Appellant was a 29-year-old Marine stationed at Camp Foster in Okinawa, Japan. He joined a group chat entitled "Camp Foster Oki" on an instant messaging platform. Within that group, the Naval Criminal Investigative Service [NCIS] maintained a dormant account named "Marie," bearing a profile picture of a teenage girl. This account was monitored by Special Agent [SA] Kilo, who played the role of a fictitious 14-year-old girl named "Marie" as part of a "to catch a predator" sting operation. Appellant initiated contact with Marie by

———————————————

[1] 10 U.S.C. § 880 (2012 & Supp. III 2016).

[2] This and all other names, other than Appellant's and those of the military judges, are pseudonyms.

[3] We have considered the fourth AOE and find it to be without merit. *See United States v. Matias*, 25 M.J. 356, 363 (C.M.A. 1987), *cert. denied*, 485 U.S. 968 (1988).

sending her a private message, "Hey."[4] In order to document the exchanges between Marie and Appellant, SA Kilo captured screen images from the NCIS tablet on which he communicated with Appellant. These screen-captured images overlapped, showing a continuous conversation with each image beginning with the last line of the previous image.[5]

Appellant and Marie chatted innocuously on two instances that day. The next evening, Appellant re-initiated and asked, "Were you the only real one on that group[?]"[6] Seven days later, Marie responded, "Haha," and that she did not know.[7] After Appellant asked Marie how she was doing, she responded, "Good you[?]" Twenty minutes later, without a response from Appellant, Marie told him, "I'm young just so ya know."[8] Appellant acknowledged this without asking her age.

The next day, Marie asked Appellant how old he was. After he answered, she told him she was 13.[9] When he replied, "Oh no," she said, "Sorry bye," and "You can block me if you want."[10] He responded, "No it's ok."[11] From that point, for the first time, they engaged in a contemporaneous back-and-forth conver-

---

[4] R. at 278, 282; Pros. Ex. 1 at 3; Pros. Ex. 3 at 1. In a post-trial affidavit, Appellant attests that he initially sent this message to the entire Camp Foster Oki group at 1238 on 2 May 2020, to which Marie responded, "Hi." Declaration of Appellant of 6 Sep 2020. However, this fact is directly controverted by Prosecution Exhibits 1 and 2, indicating the initial message, "Hey," sent on 2 May 2020 at 1238, was within a private chat between Appellant and Marie, not to the Camp Foster Oki chat as a whole. Pursuant to our Article 66 factual sufficiency review, we find the evidence proves beyond a reasonable doubt that the message was sent directly to Marie; however, for the purpose of resolving Appellant's AOEs, we assume, arguendo, Appellant's rendition of this fact is true.

[5] Prosecution Exhibit 3 shows certain messages were deleted from the NCIS tablet. While it was not made clear at trial why or how some of these messages were deleted, this fact, along with all messages—whether captured in Prosecution Exhibit 1 or noted as "deleted" in Prosecution Exhibit 3—was presented to the members at trial.

[6] Pros. Ex. 1 at 5.

[7] *Id*. at 6.

[8] *Id*. at 7.

[9] Having previously said Marie was 14, the NCIS special agent in this persona caught his inconsistency and replied that she was days away from her 14th birthday.

[10] *Id*. at 10.

[11] *Id*.

sation. At one point they discussed their age difference, and there was a miscommunication between the two:

> Appellant:  Lol. To bad ur a little to young for me. . . .
>
>     Marie:  I don't care about age [smiling and blushing emoji] But yea totally
>
>         [Marie sent a photograph of a teenage girl in response to Appellant's request for one.]
>
> Appellant:  Lol 29 seems a little old?
>
>     Marie:  Up to you we don't need to talk yea
>
>     Marie:  I'm open minded to talk to anyone. See ya!
>
> Appellant:  Ok that's fine
>
> Appellant:  If *I* [sic] wanna talk *u* can hit me up
>
>     Marie:  Oh wait I thought you were saying you didn't want to lmao
>
> Appellant:  No I do[n']t mind[12]

Following this exchange, Appellant mentioned that he and his wife were separating, so he was on the messaging platform looking for "FWB"[13] and asked if Marie knew any "older people."[14] After Marie sent a negative response and a photograph of a teenage girl with a sad face, he responded, "Wish u were not so young [sad crying emoji]."[15] The following exchange then occurred:

>     Marie:  Why
>
> Appellant:  I would come meet you
>
>     Marie:  You want to?
>
>     Marie:  Just my age is to young?
>
> Appellant:  Really?
>
>     Marie:  No like I'm asking you? I'm saying like you want to but your sketchy about me being almost 14?"

---

[12] *Id.* at 19-22 (emphasis added).

[13] *Id.* at 29 [friends with benefits].

[14] *Id.* at 30.

[15] *Id.* at 32.

Appellant: I would, how do I know ur won't be the one to get me in trouble [face with monocle emoji][16]

The two discussed the trouble they would both get into if they were caught, but then Appellant asked where they would meet. When Marie suggested the previous older man she was with "just came over to my house on nights my mom was away," he asked if she was busy "tonight or tomorrow."[17] She asked him what he would like to do, and he responded, "Lol please you lol."[18] She then generally discussed her sexual inexperience and asked him to elaborate on how he planned to "please" her, at which point Appellant turned the conversation overtly and explicitly sexual in nature.

After they conversed about what they would do and whether she had any female friends she could trust to invite over as well, they discussed the logistics of meeting up. At 1556, Appellant told Marie he would come around 2045. She told Appellant she would message him at 1900 to give him directions to her house after she had an opportunity to confirm that her mother would not be home. At 1918, Marie told Appellant she was home and available. He asked her if he could see her at 2030, and she confirmed, providing the house address. At about 2015, he arrived at the specified location. Once he stepped on the property on his way to the front door, NCIS apprehended him.

## II. DISCUSSION

### A. The Evidence is Legally and Factually Sufficient

Appellant asserts that the evidence presented at trial was factually insufficient to overcome the defense of entrapment. Appellant alleges that his initial message, "Hey," was sent to the group as a whole, not solely the Marie profile. In response, Marie initiated contact with him. After a week-long gap in communication, Marie again initiated contact. Appellant further argues that because Marie repeatedly initiated contact, and because the Government did not introduce sufficient evidence in rebuttal to demonstrate that the criminal design did not originate with the Government or that Appellant was predisposed to commit the offense, the evidence is not factually sufficient to uphold his conviction. We are not convinced that Appellant was entrapped and find his convictions both legally and factually sufficient.

---

[16] *Id*. at 33-34.

[17] *Id*. at 38.

[18] *Id*. at 39.

### 1. Test for legal and factual sufficiency

Article 66, UCMJ, requires us to conduct a de novo review and "affirm only such findings of guilty" as we find are "correct in law and fact."[19] The test for legal sufficiency is "whether, considering the evidence in the light most favorable to the prosecution, a reasonable factfinder could have found all the essential elements beyond a reasonable doubt."[20] When considering legal sufficiency, we are "bound to draw every reasonable inference from the evidence of record in favor of the prosecution."[21]

The test for factual sufficiency is "whether, after weighing the evidence in the record of trial and making allowances for not having personally observed the witnesses, [we] are . . . convinced of the [appellant']s guilt beyond a reasonable doubt."[22] We are required to take "a fresh, impartial look at the evidence," and we need not give "deference to the decision of the trial court . . . beyond the admonition in Article 66, UCMJ, to take into account the fact that the trial court saw and heard the witnesses."[23]

Reasonable doubt "is not intended [to be] a fanciful or ingenious doubt or conjecture, but an honest, conscientious doubt suggested by the material evidence or lack of it in this case. . . . The proof must be such as to exclude not every hypothesis or possibility of innocence, but every fair and rational hypothesis except that of guilt."[24]

### 2. Defense of entrapment

Under Rule for Courts-Martial 916(g), "[i]t is a defense that the criminal design or suggestion to commit the offense originated in the Government and the accused had no predisposition to commit the offense." Once the Defense has met its burden of showing some evidence that a government agent originated the suggestion to commit an offense, "the burden then shifts to the Government to prove beyond a reasonable doubt that the criminal design did not

---

[19] UCMJ art. 66.

[20] *United States v. Turner*, 25 M.J. 324, 325 (C.M.A. 1987).

[21] *United States v. Barner*, 56 M.J. 131, 134 (C.A.A.F. 2001).

[22] *Turner*, 25 M.J. at 325.

[23] *United States v. Washington*, 57 M.J. 394, 399 (C.A.A.F. 2002).

[24] *United States v. Loving*, 41 M.J. 213, 281 (C.A.A.F. 1994).

originate with the Government or that the accused had a predisposition to commit the offense, prior to first being approached by Government agents."[25]

Inducement occurs when the Government's conduct gives rise to a "substantial risk that an undisposed person or otherwise law abiding citizen would commit the offense. Inducement may take different forms, including pressure, assurances that a person is not doing anything wrong, persuasion, fraudulent representations, threats, coercive tactics, harassment, promises of reward, or pleas based on need, sympathy, or friendship."[26]

The issue of predisposition is looked at through the eyes of a law abiding person, or someone "who resists the temptations, which abound in our society today, to commit crimes."[27] "Simply because there has been government contact is not enough to establish persuasion in the mind of an innocent individual."[28] "When a person accepts a criminal offer without being offered *extraordinary* inducements, he demonstrates his predisposition to commit the type of crime involved."[29]

### *3. Appellant was not entrapped*

Even if Marie initiated communication with Appellant and the entire criminal scheme originated with the Government, the Government's evidence presented at trial was sufficient to convince us, beyond a reasonable doubt, that Appellant demonstrated a predisposition to commit the types of offenses for which he was convicted.

A person with no predisposition to commit these offenses could have, and indeed *would* have, easily cut-off communications with Marie once he learned of her age. Within minutes of the start of their conversation, Marie informed him she was 14. Later in their conversation, Appellant expressed his reluctance about her age, "I wish u were not so young."[30] When Marie asked "why,"

---

[25] *United States v. Whittle*, 34 M.J. 206, 208 (C.M.A. 1992) (citations and internal quotation marks omitted).

[26] *United States v. Howell*, 36 M.J. 354, 359-60 (C.M.A. 1993).

[27] *Id.* (quoting *United States v. Evans*, 924 F.2d 714 (7th Cir. 1991).

[28] *Whittle*, 34 M.J. at 208.

[29] *Id.* (emphasis added) (quoting *Evans*, 924 F.2d at 717).

[30] Pros. Ex. 1 at 32.

he replied, "I would come meet you."[31] But when Marie asked, "You want to?" he immediately responded, "Really?"[32]

Marie offered no *extraordinary* inducements. All she offered was the means by which Appellant could achieve his criminal intent and a reassurance he would not be caught. Appellant contemplated and conveyed the specific acts he would perform on her and even attempted to get Marie to enlist one of her friends to "have fun" with them. Once they had a plan to meet, he had a three-hour window without communications, during which he could have reconsidered. He chose to continue forward. Even if the criminal design originated with the Government—which we seriously doubt—Appellant demonstrated a clear predisposition to commit these offenses.

## B. Ineffective Assistance of Counsel

Appellant asserts that his TDC were ineffective for three reasons: (1) Mr. Charlie had a "fundamental lack of understanding of the technical aspects of the evidence" and failed to request expert assistance,[33] (2) Mr. Charlie failed to review Defense exhibits before presenting them to the members, and (3) neither of his TDC submitted a clemency request on his behalf.

We review claims of ineffective assistance of counsel de novo.[34] In *Strickland v. Washington*,[35] the Supreme Court laid out the test that guides our analysis. In order to prevail on such a claim, "an appellant must demonstrate both (1) that [trial defense] counsel's performance was deficient, and (2) that [the] deficiency resulted in prejudice."[36] Appellant bears the "burden of establishing the truth of factual matters relevant to the claim."[37] Only after an appellant has met this burden and has demonstrated both deficiency and prejudice, can we find in the appellant's favor on an ineffective assistance of counsel claim.

---

[31] *Id.*

[32] *Id.* at 33.

[33] Appellant's Brief at 12.

[34] *United States v. Harpole*, 77 M.J. 231, 236 (C.A.A.F. 2018).

[35] 466 U.S. 668 (1984).

[36] *United States v. Green*, 68 M.J. 360, 361 (C.A.A.F. 2010) (citing *Strickland*, 466 U.S. at 687).

[37] *Denedo v. United States*, 66 M.J. 114, 128 (C.A.A.F. 2008), *aff'd*, 556 U.S. 904 (2009).

### 1. *Further fact-finding not required*

After considering the record and Appellant's affidavit, we must first determine if additional fact-finding is necessary to resolve Appellant's claim of ineffective assistance of counsel. Applying factors described in *United States v. Ginn*,[38] Appellant believes "further investigation would provide valuable information for the Court in its assessment of the second prong of the *Strickland* test."[39] We disagree and conclude that additional fact-finding is unnecessary.

"If there is a factual dispute on a matter pertinent to [a] claim, the determination as to whether further fact-finding will be ordered is resolved under [*Ginn*]."[40] However, no such hearing is necessary "if an appellate court can conclude that 'the motion and the files and records of the case . . . conclusively show that [an appellant] is entitled to no relief.' "[41] The six *Ginn* factors are as follows:

> First, if the facts alleged in the affidavit allege an error that would not result in relief even if any factual dispute were resolved in appellant's favor, the claim may be rejected on that basis.
>
> Second, if the affidavit does not set forth specific facts but consists instead of speculative or conclusory observations, the claim may be rejected on that basis.
>
> Third, if the affidavit is factually adequate on its face to state a claim of legal error and the Government either does not contest the relevant facts or offers an affidavit that expressly agrees with those facts, the court can proceed to decide the legal issue on the basis of those uncontroverted facts.
>
> Fourth, if the affidavit is factually adequate on its face but the appellate filings and the record as a whole 'compellingly demonstrate' the improbability of those facts, the court may discount those factual assertions and decide the legal issue.
>
> Fifth, when an appellate claim of ineffective representation contradicts a matter that is within the record of a guilty plea, an appellate court may decide the issue on the basis of the appellate

---

[38] 47 M.J. 236 (C.A.A.F. 1997).

[39] Appellant's Brief at 26.

[40] *Denedo*, 66 M.J. at 128.

[41] *Ginn*, 47 M.J. at 244 (alterations in original) (citation omitted).

file and record (including the admissions made in the plea inquiry at trial and appellant's expression of satisfaction with counsel at trial) unless the appellant sets forth facts that would rationally explain why he would have made such statements at trial but not upon appeal.

Sixth, the Court of Criminal Appeals is required to order a fact-finding hearing only when the above-stated circumstances are not met. In such circumstances, the court must remand the case to the trial level for a *DuBay* proceeding. During appellate review of the *DuBay* proceeding, the court may exercise its Article 66 fact-finding power and decide the legal issue.[42]

Before us now, Appellant has submitted a declaration, making a number of statements he believes are pertinent to his claim. We have reviewed his statements and find that even assuming the facts to be as Appellant claims, he would not be entitled to any relief. Therefore, no further fact finding is necessary in order to resolve Appellant's claims.

### 2. *Appellant suffered no prejudice from any alleged deficiencies of TDC*

The two-prong approach laid out in *Strickland* is not a sequential test. We need not always determine "whether counsel's performance was deficient before examining the prejudice suffered by the [appellant] as a result of the alleged deficiencies. If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, . . . that course should be followed."[43] Here we can dispose of this claim for lack of prejudice.

In light of our holding *supra* on the issues of entrapment and factual sufficiency, Appellant's first ground for complaint of ineffective assistance, not understanding the technical aspects of the evidence regarding entrapment, is without merit. Aside from a barrage of speculation as to what an expert witness might have been able to do had he been called, Appellant claims the "decision to forego expert assistance in digital forensics . . . greatly prejudiced [him] in that it undercut his ability to present an entrapment defense."[44] He makes no additional concrete claims of prejudice suffered due to a lack of an expert witness. Even assuming—contrary to the evidence—Appellant's version of events to be true, he suffered no prejudice by this alleged error. We also find that even had the Defense presented enough evidence that messages had been

---

[42] *Ginn*, 47 M.J. at 248.

[43] *Strickland*, 466 U.S. at 689.

[44] Appellant's Brief at 20.

deleted so as to cause the military judge to exclude the conversation between Appellant and Marie [Prosecution Exhibit 1], no evidence was presented to show that Prosecution Exhibit 3 [the "Extraction Report" of the NCIS tablet containing the conversations] was incomplete, and that exhibit alone would have been sufficient to uphold Appellant's conviction.

We therefore turn to Appellant's remaining claims of ineffective assistance and find he suffered insufficient, if any, prejudice. To demonstrate prejudice, "[i]t is not enough for the defendant to show that the errors had some conceivable effect on the outcome of the proceeding."[45] Instead, "[t]he defendant must show that there is a reasonable probability that but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is probability sufficient to undermine confidence in the outcome."[46] When an appellant was actually or constructively denied assistance of counsel altogether, or when counsel is burdened by an actual conflict of interest (and actually represents those conflicting interests), we presume prejudice.[47] However, Appellant makes neither of these claims, and the record does not support either.

The Defense offered Defense Exhibit I, Appellant's video-recorded confession. The military judge admitted it, but only after ordering redaction to remove references to a polygraph examination and to Appellant's prior "sexting." Before playing the video recording in open court for the members, Mr. Charlie neglected to review the edited version. During playback, after noticing a reference to Appellant "struggling with a test"[48] and a reference to "sexting"[49] previously with a girl in South Carolina, Mr. Charlie interrupted and asked for an opportunity to review Defense Exhibit I before continuing to play it for the members.

Any deficiency by Mr. Charlie for failing to review Appellant's videotaped confession prior to publication did not prejudice Appellant. The brief reference to "struggling with a test" that was left unredacted provided the members with

---

[45] *Strickland*, 466 U.S. at 693.

[46] *Id.*

[47] *Id.* at 692.

[48] R. at 501.

[49] *Id.*

very little, if any, inflammatory material and would require extreme speculation to deduce it was a polygraph.[50] The military judge noted that none of the members reacted to the phrase "struggling with a test" and "no one brought attention to it."[51] This is insufficient to demonstrate prejudice, particularly when coupled with the Government's agreement not to mention the references in argument and Mr. Charlie tactical decision not to ask for a limiting instruction so as not to draw attention to the matters.

Additionally, Appellant's argument that the members may have interpreted the brief reference to sexting a "girl" in South Carolina to mean that she was underage, thus undermining his entrapment defense, is insufficient to demonstrate prejudice. First, we have resolved the issue of entrapment, without regard to the reference to sexting, above—Appellant was not entrapped. Furthermore, the conclusion suggested by Appellant requires significant speculation and certainly does not give rise to a "reasonable probability" of error "sufficient to undermine confidence in the outcome."

Most importantly, the evidence against Appellant was overwhelming. Appellant does not allege the improper reference to "sexting" or "struggling with a test" prejudiced him in sentencing; he merely suggests it contributed to his conviction. We are confident had these redactions been properly made, the outcome would have remained the same. Appellant engaged in rather routine, if sordid, misconduct. The chat history, with the explicit language explaining what Appellant intended to do to Marie, was preserved and presented at trial in multiple forms. Appellant made a lengthy confession to NCIS, which was videotaped and presented at trial. The improper references to struggling with a test and sexting did very little, if anything, to contribute to Appellant's conviction.

Finally, Appellant claims his defense counsel were deficient in their post-trial responsibilities. He states, "[Capt Lima] submitted a request to the Convening Authority asking him to defer the adjudged and automatic reduction in rank until Convening Authority's Action" but "did not include a request to defer either the adjudged or automatic forfeitures."[52] After complaining about a

---

[50] One of the special agents told Appellant during the interview, "You're clearly struggling on this test. And the reason why you're struggling is because in your conversations with (other special agent) earlier, you weren't completely forthcoming." This was not redacted and heard by the members. Def. Ex. I.

[51] R. at 502.

[52] Appellant's Brief at 24.

lack of communication from his counsel, Appellant requested and was granted a substitute military counsel, Capt Oscar, to handle his post-trial matters. Capt Oscar signed for the Staff Judge Advocate's Recommendation and indicated that he would submit a clemency request on Appellant's behalf, but ultimately did not do so. Appellant claims that this failure prejudiced him by "eliminating his opportunity to request further clemency for the benefit of his wife and children."[53] However, Appellant acknowledges that despite this failure to request clemency, the convening authority *granted* deferral for the reduction in rank and automatic forfeitures. It is mere speculation to suppose that the convening authority would have awarded *more* clemency had it been requested—such speculation is insufficient to demonstrate prejudice.

## C. Excusal of Detailed Defense Counsel

### 1. Facts surrounding Captain Lima's withdrawal

Capt Lima was detailed as Appellant's military defense counsel. Appellant subsequently consulted with and obtained Mr. Charlie as his lead TDC. On the last day of trial on the merits at 0759, the military judge called the court to order and stated on the record that Capt Lima's "child had some health issues last night," and that "[h]e is attending to those, but we anticipate he will be back when the members return at 0900."[54] At that point, the military judge reminded Appellant of his right to "have all of [his] lawyers present in *all* sessions of court."[55] After Appellant confirmed that he understood his right, the military judge asked, "Are you willing to do this 39(a) session without [Capt Lima] being present?" Appellant replied, "Yes, sir." After quickly discussing a few administrative matters, the court recessed at 0803.

At 0926, the court reconvened. The military judge stated:

> [Captain Lima], unfortunately, is still not present. It appears that he's not going to be present, potentially for the entire rest of the trial due to the nature of the emergency. Staff Sergeant, I know I just discussed it with you, you obviously have the right to have all your counsel present *throughout the trial*. Do you

---

[53] *Id.* at 25.

[54] R. at 488.

[55] *Id.*

want to proceed with the rest of the trial *on the merits* without [Capt Lima] being present?[56]

Appellant replied, "Yes, Your Honor."[57]

The military judge then discussed the Defense request to postpone sentencing to the next day: "We discussed the way forward, defense indicated that [Capt Lima] was planning on handling the sentencing portion of the trial. *Given that he likely won't be back, defense asked that if there is a conviction in this case that we postpone sentencing until tomorrow.*"[58] He agreed that such a request was "certainly . . . reasonable given the circumstances, and that he would postpone the sentencing phase until the next day.[59] At no other point did Appellant object or Mr. Charlie request additional time to prepare for sentencing.

### 2. *Appellant expressly consented to the withdrawal of Captain Lima*

Appellant alleges that his defense counsel was excused by the military judge without good cause shown on the record and without Appellant's informed express consent. When an accused's case is referred to a general or special court-martial, he is represented by a "statutorily qualified military defense counsel, known as detailed military defense counsel."[60] In addition to this detailed counsel, an accused may choose to be represented by a civilian defense counsel at no cost to the Government.[61] When this happens, the detailed military counsel "shall act as associate counsel unless excused at the request of the accused."[62] The authority competent to detail such counsel may excuse a detailed military counsel, among other reasons, "[u]pon request of the accused" or "[f]or other good cause shown on the record."[63] " '[G]ood cause' includes physical disability, military exigency, and other extraordinary circumstances which render the member, counsel, or military judge unable to proceed with the court-

---

[56] *Id.* at 491 (emphasis added).

[57] *Id.*

[58] *Id.* (emphasis added).

[59] *Id.*

[60] *United States v. Hutchins*, 69 M.J. 282, 284 (C.A.A.F. 2011) (citing UCMJ art. 27(a)(1), 10 U.S.C. § 827(a)(1) (2006)).

[61] UCMJ art. 38(b)(2).

[62] UCMJ art. 38(b)(4).

[63] Rule for Courts-Martial [R.C.M.] 505(d)(2)(B).

martial within a reasonable time," and "does not include temporary inconveniences which are incident to normal conditions of military life."[64]

There is no need to show good cause to withdraw as counsel in cases where the detailed military defense counsel seeks to withdraw "with the express consent of the accused."[65] The record of trial makes it clear Appellant acquiesced to Capt Lima's withdrawal. In *United States v. Hutchins*, the Court of Appeals for the Armed Forces [CAAF] found error when detailed military defense counsel unilaterally withdrew due to the end of his active duty service. CAAF noted that the military judge presumed counsel's absolute unavailability, "present[ing] the termination of the attorney-client relationship as an established fact without ascertaining whether any consideration had been given to other available options."[66] That is not the case we are confronted with.

Each time the military judge received updated information on the availability of Capt Lima, the military judge reminded Appellant of his right to have counsel present at *all* proceedings and asked if he wished to continue forward. Appellant acknowledged his understanding of his rights and clearly stated that he wished to press forward with Mr. Charlie and without Capt Lima. At no point did the military judge receive or approve a request to withdraw; instead, Appellant expressly consented to Capt Lima's *absence*. Although initially his absence was expected to be brief, shortly thereafter it became clear that he would not return for the rest of trial. The fact that Mr. Charlie contemplated needing more time to prepare for sentencing demonstrates the understanding of all parties that Capt Lima would not return for the remainder of the trial—on the merits or sentencing.

In *United States v. Royer*,[67] an unpublished case, we found the appellant consented to his TDC's withdrawal. When Royer pleaded guilty, the military judge ordered a mental competency evaluation. In the ensuing two months before the court-martial reconvened, Royer's TDC informed the trial counsel and the military judge that he had a conflict of interest between Royer and another client. The military judge informed Royer that his TDC was removed from the case due to circumstances beyond Royer's control. Later, on the record, the military judge confirmed with Royer that he had enough time to discuss the case

---

[64] R.C.M. 505(f).

[65] R.C.M 506(c).

[66] *Hutchins*, 69 M.J. at 289.

[67] No. 200600530, 2007 CCA LEXIS 67 (N-M. Ct. Crim. App. 2007) (unpub. op.).

with his new TDC, that he felt comfortable with his new TDC, and that he did not wish to be represented by any other attorney.

Here the military judge engaged in a similar colloquy with Appellant and ascertained that Appellant was aware of his rights, and that he was comfortable proceeding into sentencing without Capt Lima.[68] Under the circumstances it seems very likely that if Appellant had answered differently, the military judge would have granted a continuance. This record presents us with an informed consent by Appellant to Capt Lima's withdrawal.

### 3. Any error was harmless

Assuming, arguendo, that Appellant did not consent to Capt Lima's withdrawal, we would nonetheless decline to award relief in this case.[69] When an appellant establishes that an error of law occurred during trial, the defense must also show that the error produced material prejudice to the substantial rights of the accused.[70] Because "[t]his case involves defense counsel's improper withdrawal from an attorney-client relationship but with assurance of his client's uninterrupted representation by another lawyer and followed by the client's subsequent knowing ratification of that withdrawal," it is proper to test for prejudice.[71]

As in *Hutchins*, any error that exists in the excusal of Appellant's detailed military defense counsel merely involves "oversights and omissions in addressing the issue of severance."[72] It does not involve governmental misconduct (or any action whatsoever) or decisions by the military judge to deny relief requested by the defense.[73] The military judge here, as in *Hutchins*, granted the

---

[68] The context in the colloquy concerning whether Capt Lima would not be present for the "rest of the trial" appears to include sentencing, if necessary. It also appears Mr. Charlie understood this, as did Appellant. Mr. Charlie requested, and received, a one-day postponement to prepare for sentencing, due to Captain Lima's absence for the "rest of the trial." R. at 491.

[69] *See United States v. Acton*, 38 M.J. 330, 336-37 (C.M.A. 1993) (finding that despite the improper unilateral withdrawal of detailed defense counsel, appellant could not demonstrate prejudice).

[70] UCMJ art. 59(a).

[71] *Acton*, 38 M.J. at 336 n.2. Although Appellant views this as structural error, we decline to review this as such. His claim is that he was denied a statutory right to detailed defense counsel; he was, however, afforded the counsel of his choosing.

[72] *Hutchins*, 69 M.J. at 292.

[73] *See id.*

only defense request for continuance, and it would be mere speculation, unsupported by the record, to presume an additional request for continuance would have been denied. Because Appellant assented to the absence of Capt Lima, we find this AOE to be without merit.

### III. CONCLUSION

After careful consideration of the record and briefs of appellate counsel, we have determined that the findings and sentence are correct in law and fact and that no error materially prejudicial to Appellant's substantial rights occurred. UCMJ arts. 59, 66.

The findings and sentence are **AFFIRMED**.

Chief Judge Emeritus CRISFIELD and Judge LAWRENCE concur.

FOR THE COURT:

RODGER A. DREW, JR.
Clerk of Court