*This opinion is subject to administrative correction before final disposition.*

# United States Navy–Marine Corps
# Court of Criminal Appeals

Before
GASTON, HOUTZ, and MYERS
Appellate Military Judges

———————————————

**UNITED STATES**
*Appellee*

**v.**

**Eric N. VANCE**
Lance Corporal (E-3), U.S. Marine Corps
*Appellant*

**No. 202100024**

———————————————

Decided: 22 June 2022

Appeal from the United States Navy-Marine Corps Trial Judiciary

Military Judges:
Wilbur Lee (arraignment)
Melanie J. Mann (motions)
Ann K. Minami (motions, trial)

Sentence adjudged 29 October 2020 by a general court-martial con-
vened at Marine Corps Base Hawaii, consisting of officer and enlisted
members. Sentence in the Entry of Judgment: reduction to E-1, confine-
ment for 15 months, and a dishonorable discharge.

For Appellant:
*Lieutenant Commander Michael W. Wester, JAGC, USN*

For Appellee:
*Captain Tyler W. Blair, USMC*
*Lieutenant Commander Gabriel K. Bradley, JAGC, USN*

*Major Kerry E. Friedewald, USMC*

Judge HOUTZ delivered the opinion of the Court, in which Senior Judge GASTON and Judge MYERS joined.

_____

**This opinion does not serve as binding precedent, but may be cited as persuasive authority under NMCCA Rule of Appellate Procedure 30.2.**

_____

HOUTZ, Judge:

Appellant was convicted, contrary to his pleas, of attempted sexual assault of a child, attempted sexual abuse of a child, and attempted extramarital sexual conduct, in violation of Article 80, Uniform Code of Military Justice [UCMJ],[1] for communicating indecent language to and attempting to have sex with a person Appellant believed was 13-years-old.

Appellant asserts 10 assignments of error [AOEs]: (1) the military judge abused her discretion by removing two members over defense objection and not granting a defense implied-bias challenge to another member; (2) the panel was improperly constituted where at least one member was solicited and volunteered; (3) the military judge erred by denying production of Officer Sierra,[2] the undercover law enforcement agent who had pretended to be the underage girl on the phone; (4) the military judge erred by not allowing the Defense to argue in closing that the Government had to prove Appellant's predisposition to commit the offense beyond a reasonable doubt; (5) the military judge erred by failing to issue a tailored entrapment instruction; (6) the military judge erred by admitting Appellant's communications with others to show propensity; (7) the record of trial is incomplete;[3] (8) the evidence is legally and factu-

---

[1] 10 U.S.C. § 880.

[2] All names in this opinion, other than those of Appellant, the judges, and appellate counsel, are pseudonyms.

[3] The alleged missing items were either in the record already (Appellate Ex. LVII was incorrectly referenced by the military judge as Appellate Ex. XXV, R. at 178), not required to be included in the record of trial (discovery documents relating to the case activity summary referenced in Appellate Ex. XXXIX), or subsequently attached to the

ally insufficient to sustain Appellant's convictions; (9) the findings and sentence should be set aside for cumulative error;[4] and (10) Appellant was denied due process when the military judge denied his motion for a unanimous verdict instruction. We find no prejudicial error and affirm.

## I. BACKGROUND

Appellant's convictions arise from his online and telephonic conversations in which he made sexual advances to an individual who he believed was a 13-year-old girl, but was actually a law enforcement agent. Appellant, who was married, then drove to the purported minor's home with a box of condoms, parked his car, walked to the house, and was apprehended when he went in the front door. Additional facts are included as needed within their respective AOEs.

## II. DISCUSSION

### A. Excusal of Panel Members for Good Cause and Implied Bias

Appellant asserts the military judge erred in granting two Government challenges for cause and denying a Defense challenge. We review a military judge's rulings on challenges for cause for an abuse of discretion.[5] While rulings based on actual bias are afforded a high degree of deference, we review "implied bias challenges pursuant to a standard that is less deferential than abuse of discretion, but more deferential than de novo review."[6] "We will afford a military judge less deference if an analysis of the implied bias challenge on the record is not provided."[7] While we do not "expect record dissertations from the military judge's decision on implied bias," we do "require a clear signal that the

---

record after Appellant's initial brief (the military judge's original ruling regarding officer Sierra's production as a witness referenced in Appellate Ex. XXXIII), rendering this AOE moot. *See United States v. Matias*, 25 M.J. 356, 363 (C.M.A. 1987).

[4] As we do not find error in the individual AOEs, we find Appellant's assertion of cumulative error to be without merit. *See Matias*, 25 M.J. at 363.

[5] *United States v. Woods*, 74 M.J. 238, 243 (C.A.A.F. 2015).

[6] *United States v. Hennis*, 79 M.J. 370, 385 (C.A.A.F. 2020) (internal citation omitted).

[7] *United States v. Peters*, 74 M.J. 31, 34 (C.A.A.F. 2015).

military judge applied the right law" which generally extends beyond mere "[i]ncantation of the legal test without analysis" in close cases.[8]

Panel members "shall be excused for cause whenever it appears that a member . . . [s]hould not sit as a member in the interest of having the court-martial free from substantial doubt as to legality, fairness, and impartiality."[9] However, "not every contretemps during voir dire rises to the level of a constitutionally unfair trial" and "[r]esponses to voir dire need not be pristine to satisfy the constitutional minimum of a fair trial . . . or even [Rule for Courts-Martial] R.C.M. 912's requirement that a court-martial appear fair to the observing public."[10] Courts have consistently used "an objective standard in determining whether implied bias exists" that looks at "the totality of the circumstances."[11] That is,

> we test for implied bias not on the subjective qualities of the panel member, but on the effect that panel member's presence will have on the public's perception of whether the appellant's trial was fair. Thus, although a panel member's good character can contribute to a perception of fairness, it is but one factor that must be considered in the context of the other issues raised concerning that individual's panel membership.[12]

"While cast as a question of public perception, this test may well reflect how members of the armed forces, and indeed the accused, perceive the procedural fairness of the trial as well."[13]

For challenges by the Defense, "[m]ilitary judges apply a liberal-grant mandate in ruling on challenges for cause," which "recognizes the unique nature of military courts-martial panels, particularly that those bodies are detailed by convening authorities and that the accused has only one peremptory challenge."[14]

---

[8] *Id.*

[9] R.C.M. 912(f).

[10] *United States v. Commisso*, 76 M.J. 315, 321 (C.A.A.F. 2017) (internal quotation marks and citations omitted).

[11] *Peters*, 74 M.J. at 34 (internal quotation marks and citation omitted).

[12] *Id.* at 35.

[13] *Id.* at 34.

[14] *United States v. Campbell*, 76 M.J. 644, 659 (C.A.A.F. 2017) (internal quotation marks and citations omitted).

### 1. *The Excusal of Staff Sergeant John for Health and Distraction Concerns*

Military judges are required to "[e]nsure that the dignity and decorum of the proceedings are maintained."[15] "Courts-martial should be conducted in an atmosphere which is conducive to calm and detached deliberation and determination of the issues presented and which reflects the seriousness of the proceedings."[16] Even after assembly, the military judge may excuse members for good cause, which includes "physical disability, military exigency, and other extraordinary circumstances which render the member, counsel, or military judge or military magistrate unable to proceed with the court-martial within a reasonable time."[17]

The Government challenged Staff Sergeant John due to his persistent cough. When questioned during voir dire, he stated that he was awaiting COVID-19 test results, that he was asymptomatic with regard to COVID-19 except for the cough, and that the cough was due to being outside in the heat then coming inside to a cooler area.[18] Trial defense counsel objected to the Government's challenge, arguing among other things that Staff Sergeant John was the "only member on this panel who is African American . . . [s]o if he is kicked, there will be no member as a result who reflects the race of [Appellant]."[19] The military judge excused Staff Sergeant John, noting that his cough was distracting, that it was a "productive" cough as opposed to a dry cough, and that he himself was concerned enough to be tested for COVID-19.[20]

Under these circumstances, we hold that the military judge did not err in granting the challenge for cause. Excusing Staff Sergeant John for his distracting cough and pending COVID-19 test in a time period where COVID-19 was having a global impact on health meets the definition of extraordinary circumstances and satisfies good cause as defined in R.C.M. 505(f). Further, as held by our superior Court, we decline to apply *Batson v. Kentucky* to non-peremptory challenges.[21] Even if *Batson* challenges were so applied, the fact that Staff

---

[15] R.C.M. 801(2).

[16] R.C.M. 801(2) Discussion.

[17] R.C.M. 505(c)(2), R.C.M. 505(f).

[18] R. at 396.

[19] *Id*. at 400.

[20] *Id*. at 401.

[21] *See United States v. Bess*, 80 M.J. 1, 8 (C.A.A.F. 2020) (citing *Batson v. Kentucky*, 476 U.S. 79, 96-97 (1986)).

Sergeant John, who was the only African-American on the panel, was distract-edly coughing and pending a COVID-19 test is a race-neutral reason for his excusal, and we are convinced that he was excused for the race-neutral reasons of coughing and a pending COVID-19 test. We are also convinced that the pub-lic has enough understanding of the COVID-19 pandemic and the precautions surrounding it that his excusal did not create an overriding appearance of un-fairness in Appellant's court-martial.

### 2. *The Defense's Implied Bias Challenge Against Sergeant Juliet*

The Defense's implied bias challenge against Sergeant Juliet revolved around his answers to questions regarding adultery charges.[22] Specifically, he indicated in group voir dire that he had "strong beliefs in favor of the military's criminalization of adultery,"[23] although he also gave a negative response to the question, "[w]ould any member form a strong negative opinion against a person accused of attempting to cheat on his spouse?"[24] During individual voir dire, he stated,

> I feel like an NJP for cheating on your wife or your husband is proper considering – I mean, we work together and we're here like – let me think. We're defending our nation and we're, like, setting our own standards and we're supposed to be better than, like, civilians and stuff like that. So you promised your life to them and if you're out there cheating on them, then how are we supposed to trust you at work if you can't uphold the simple po-lice [sic] of that?[25]

Sergeant Juliet stated his belief that the "standard should be upheld and you should be punished if you break those standards."[26] However, in clarifying his remarks, Sergeant Juliet said that he would "[a]bsolutely" be able to consider someone accused of adultery innocent until proven guilty, and that he would be able to set aside his judgment until guilt was proven beyond a reasonable doubt, because he "[felt] like that's what our nation's based off of, like, part of our constitutional rights and everything. Like, because if we didn't have rea-sonable doubt, then anybody could just get pulled in for anything . . . So I feel

---

[22] R. at 466.

[23] *Id.* at 413-14.

[24] *Id.* at 413.

[25] *Id.* at 461-62.

[26] *Id.* at 466.

like it's good – a good form of justice."[27] Sergeant Juliet also indicated that "you get the punishment and you go on, but I don't think anybody should be seen differently because of that"[28] and indicated he would be able to follow the military judge's instructions.[29]

The military judge analyzed the Defense's implied bias challenge on the record, stating that Sergeant Juliet "appeared to take seriously this duty that he is presented with," "did not express any sort of agenda," gave "firm, but not inelastic" responses, and indicated he "believe[d] in reasonable doubt," such that the military judge was "confident that the public would not doubt the fairness of this proceeding by having Sergeant [Juliet] on the panel."[30] She therefore denied the Defense challenge.

We find no error with the military judge's analysis, which we afford more deference because it is documented in the record.[31] While her observations of the member's demeanor are normally used to assess actual bias, our superior court has found they are "also relevant to an objective observer's consideration" in addressing questions of implied bias.[32] Sergeant Juliet appeared willing to follow the military judge's instructions and apply the law to the specific facts of the case in order to determine whether or not the beyond-a-reasonable-doubt standard was met. He indicated that he agreed to consider all possible sentences and remain open-minded until closed-session deliberations.[33] And as we discuss further below, we find no merit to Appellant's argument that Sergeant Juliet's volunteering evidenced a differing mentality that gave rise to implied bias. Therefore, we agree with the military judge's conclusion that, even in light of the liberal grant mandate, Sergeant Juliet was not subject to exclusion because his presence on the panel did not negatively impact the public's perception of the fairness of Appellant's court-martial.

---

[27] *Id.* at 461-63.

[28] *Id.* at 466-67.

[29] *Id.* at 389-90.

[30] *Id.* at 490-91.

[31] *See Peters*, 74 M.J. at 34.

[32] *United States v. Downing*, 56 M.J. 419, 423 (C.A.A.F. 2002).

[33] R. at 390.

*3. The Government's Challenge Against Master Sergeant Day*

Master Sergeant Day was personally accused of sexual assault in 2004 and was investigated by the San Diego police department. He reported on his questionnaire that he believed he would be unable to sit a "sexual assault" trial "without clear evidence" because of the previous accusation against him.[34] When asked about the show "To Catch a Predator," he said the show "does . . . make you feel angry at the individual because they definitely seem guilty from the beginning."[35] In clarifying his answer, he stated, "[I]n general, the crime itself is repulsive," but also stated that the individual was "innocent until proven guilty and . . . gets a fair trial."[36] However, he stated that he would "just weigh differently" and would "need more evidence" than circumstantial evidence in a sexual assault case with two adults because there was "probably some bias on [his] end."[37]

The military judge granted the Government's challenge against Master Sergeant Day for actual and implied bias.[38] Because of the lack of clarity in the record as to whether the excusal was due to implied bias or actual bias, we test for implied bias and give the military judge less deference.[39] That said, even without deference, we agree with the military judge's ruling. To allow someone who had been previously accused of and investigated for sexual assault and was admittedly still harboring "some bias" due to that experience would certainly call into question whether the court-martial would be free from substantial doubt as to its "legality, fairness, and impartiality."[40] We therefore find the military judge did not err in excusing Master Sergeant Day.

**B. The "Volunteer" on Appellant's Court-Martial Panel**

We review the issue of improperly selected members under a forfeiture standard if the moving party fails to make a timely motion.[41] A motion for improper selection is timely if it is "[b]efore the examination of members . . . or at

---

[34] *Id*. at 422-24.

[35] *Id*. at 425.

[36] *Id*. at 426.

[37] *Id*. at 424.

[38] *Id*. at 479.

[39] *See Peters*, 74 M.J. at 34.

[40] R.C.M. 912(f).

[41] R.C.M. 912(b)(3).

the next session after a party discovered or could have discovered by the exercise of diligence, the grounds therefore, whichever is earlier."[42] Allegations of improper exclusion of qualified personnel from the selection process that were not forfeited are reviewed de novo.[43]

We "will not speculate as to what sort of biases will be reflected in a jury chosen on the basis of its members' willingness to depart from their daily business and serve as jurors," but "condemn the practice of soliciting only volunteers for the panel pool" because volunteerism is an "irrelevant variable injected into the selection of the panel pool."[44] Where "error in preliminarily screening the members was not merely an 'administrative mistake,'" the government "has the burden to demonstrate that the error did not 'materially prejudice the substantial rights of the accused.'"[45] We conduct a three-part test in evaluating potentially deficient member selection by evaluating "the motive of those involved in the preliminary screening of panel members, the nature of the preliminary screening variable of volunteerism, and its impact on the selection of the members."[46] However, generally, "the preliminary screening variable of volunteerism is irrelevant" if "[t]here is no showing that this variable operated to exclude a discernable group or to diminish the representative nature of the pool."[47]

Here, when asked whether he volunteered or was assigned to the court-martial panel, Sergeant Juliet stated during individual voir dire that he was "asked . . . and I volunteered for it."[48] He confirmed that he was one of two sergeants in his division who were asked separately whether they wanted to be a member on a court-martial and that the other sergeant did not want to do it.[49] Sergeant Juliet further explained that he wanted to be a court-martial member "[j]ust to see what it was," that he did not know what he would be doing as a member, and that he did not have a passion for the law or military

---

[42] R.C.M. 912(b)(1).

[43] *See United States v. Bartee*, 76 M.J. 141, 143 (C.A.A.F. 2017).

[44] *United States v. Dowty*, 60 M.J. 163, 173 (C.A.A.F. 2004) (quoting *United States v. Kennedy*, 548 F.2d 608, 609 (5th Cir. 1977)) (internal quotation marks omitted).

[45] *Id.* (citing Article 59(a), UCMJ, 10 U.S.C. § 859(a) (2000)).

[46] *Id.*

[47] *Id.*

[48] R. at 464.

[49] *Id.* at 465.

justice, but that he believed "in our law system—our judicial system within the Marine Corps."[50]

The Defense challenged Sergeant Juliet's volunteerism at the conclusion of voir dire, stating Sergeant Juliet was "pulled into a room and asked whether he wanted to volunteer for this court-martial" and that he "volunteered for this because he wanted the experience."[51] While the challenge was framed only as an implied-bias challenge, and not necessarily as an improper member selection under Article 25, UCMJ, we find that "[t]o require more from the Defense would needlessly elevate form over substance and frustrate modern practice."[52] We therefore review the issue de novo.[53]

The nature of Sergeant Juliet's volunteering, the fact that he was the only member who volunteered, and the responses that he gave in both individual and group voir dire do not lead to a conclusion that there was any improper motive in soliciting or accepting Sergeant Juliet's volunteering or that his volunteering had any discernable impact on the convening authority's selection of members. There is nothing to suggest that the fact that Sergeant Juliet volunteered when asked by his direct supervisor was communicated to, much less used by, the convening authority in selecting him as opposed to the factors in Article 25, UCMJ. Due to the specific factors surrounding Sergeant Juliet, we "find that there is no appearance of unfairness arising from the service of any . . . volunteer member[] in this case."[54]

## C. Denial of the Defense Motion to Produce Agent Sierra

A military judge's decision to produce or deny production of a witness is reviewed for abuse of discretion.[55] The denial of a requested witness will not be overturned unless there is a "definite and firm conviction" that there was a

---

[50] *Id.* at 466.

[51] *Id.* at 488.

[52] *United States v. Ayalacruz*, 79 M.J. 747, 749 (N-M. Ct. Crim. App. 2020).

[53] *See Bartee*, 76 M.J. at 143.

[54] *Dowty*, 60 M.J. at 175. However, we reiterate the condemnation of soliciting volunteers for the panel pool: while generally it is an irrelevant variable, it is a needless variable nonetheless, and there are cases where soliciting and selecting volunteers for service on a court-martial panel will result in error. The fact that this is not one of those cases does not serve as an endorsement to the practice.

[55] *United States v. Rockwood*, 52 M.J. 98, 104 (C.A.A.F. 1999).

"clear error of judgment in the conclusion it reached upon a weighing of the relevant factors."[56]

Parties are "entitled to the production of any witness whose testimony on a matter in issue on the merits or on an interlocutory question would be relevant and necessary."[57] There are several factors that have been outlined to analyze whether or not a witness must be granted, including: "the issues involved in the case and the importance of the requested witness as to those issues; whether the witness' testimony would be merely cumulative; and the availability of alternatives to the personal appearance of the witness, such as deposition, interrogatories, or previous testimony."[58] However, "[t]he Court has never fashioned an inelastic rule to determine whether an accused is entitled to the personal attendance of a witness."[59]

Here, the Government initially granted Appellant's request to produce as a witness the law enforcement officer who posed as the underage victim, Agent Sierra. However, after an email describing Agent Sierra's reticence to travel due to COVID-19 health concerns and financial hardship, the Government rescinded its grant of Agent Sierra as a witness. The military judge thereafter denied the Defense's motion to produce Agent Sierra and its subsequent motion for reconsideration of same.

We find no abuse discretion in the denial of Agent Sierra as a witness. The online and telephonic conversations she had with Appellant were all recorded, produced in discovery, and admitted into evidence for the members' consideration.[60] Thus, the members could see Agent Sierra's exact expressions in her photos and hear the exact words and inflection in her voice in the audio recordings when determining issues such as whether the Government induced Appellant to commit these offenses. In addition, another law enforcement agent who testified, Agent Bravo, had extensive personal knowledge of the circumstances surrounding the conversations, as she had participated in, observed, or listened in on each of the conversations as they occurred.[61] Agent Sierra's testimony was cumulative of this other testimony and evidence.

---

[56] *Hennis*, 79 M.J. at 381.

[57] R.C.M. 703(b)(1).

[58] *United States v. Tangpuz*, 5 M.J. 426, 429 (C.M.A. 1978).

[59] *Id.*

[60] Pros. Exs. 3–6.

[61] R. at 569–70.

**D. Limitation of the Defense's Closing Argument on Entrapment**

Rulings limiting closing argument are reviewed for abuse of discretion.[62] Entrapment is an affirmative defense that "the criminal design or suggestion to commit the offense originated in the Government and the accused had no predisposition to commit the offense."[63] The pertinent R.C.M. provides:

> The defense has the initial burden of going forward to show that a government agent originated the suggestion to commit the crime. Once the defense has come forward, the burden then shifts to the [g]overnment to prove beyond a reasonable doubt that the criminal design did not originate with the [g]overnment or that the accused had a predisposition to commit the offense.[64]

Government origination, or inducement, occurs when a government actor "creates substantial risk that an undisposed person or otherwise law-abiding citizen would commit the offense."[65] It includes "pressure, assurances that a person is not doing anything wrong, persuasion, fraudulent representations, threats, coercive tactics, harassment, promises of reward, or pleas based on need, sympathy, or friendship."[66] Inducement does not include government actors "merely provid[ing] the opportunity or facilities to commit the crime or use artifice or stratagem."[67] Generally, even repeated requests "do not in and of themselves constitute the required inducement." [68]

Here, the following exchange occurred between the military judge and Appellant's trial defense counsel [TDC] regarding the Defense's closing argument on the issue of entrapment:

> MJ:    I do not want the defense in their argument to state that the government must prove predisposition beyond a reasonable doubt. Taking that conflicts with

---

[62] *United States v. Bess*, 75 M.J. 70, 75 (C.A.A.F. 2016).

[63] R.C.M. 916(g).

[64] *United States v. Hall*, 56 M.J. 432, 436 (C.A.A.F. 2002) (quoting *United States v. Whittle*, 34 MJ 206, 208 (C.M.A. 1992)).

[65] *Id.* (quoting *United States v. Howell*, 36 M.J. 354, 359–60 (C.M.A. 1993)).

[66] *Id.*

[67] *Id.*

[68] *Id.* (internal quotation marks omitted).

> the law that I am reading them, which is that the government must prove beyond a reasonable doubt that the accused was not entrapped.

> TDC: Ma'am, the defense would just argue that, that conflicts with case law governing entrapment saying that the government needs to prove that the accused was not entrapped beyond a reasonable doubt . . . And the Court of Appeals for the Armed Forces, explicitly states that once the defense has raised the use of entrapment by showing some inducement, the burden then shifts to the government to prove predisposition.[69]

Appellant's position on appeal, as at trial, is that the military judge's view during this exchange is a misstatement of the law. We disagree. While the burden does shift to the government after the defense shows some evidence that the suggestion to commit the crime originated with the government, the government must then prove beyond a reasonable doubt *either* "that the criminal design did not originate with the [g]overnment *or* that the accused had a predisposition to commit the offense."[70] In other words, the burden shifts to the government to prove beyond a reasonable doubt that, one way or the other, the accused was not entrapped. That is exactly what the military judge instructed the members in this case and exactly what the military judge allowed the Defense to argue during closing argument. The military judge did not abuse her discretion in limiting Defense's closing argument to restating the entrapment defense's proper elements and burden shifting.

**E. Instructions on the Defense of Entrapment**

"When deciding whether the military judge properly instructed a panel, this Court uses a de novo standard of review."[71] However, a military judge's

---

[69] R. at 861–62.

[70] *Hall*, 56 M.J. at 436 (quoting *Whittle*, 34 M.J. at 208) (emphasis added). *See also Jacobson v. United States*, 503 U.S. 540, 548–49 (1992) ("[T]he prosecution must prove beyond a reasonable doubt that the defendant was disposed to commit the criminal act prior to first being approached by Government agents" only "where the Government has induced an individual to break the law and the defense of entrapment is at issue.")

[71] *United States v. Bailey*, 77 M.J. 11, 14 (C.A.A.F. 2017) (citing *United States v. Schroder*, 65 M.J. 49, 54 (C.A.A.F. 2007)).

decision regarding tailored instructions is reviewed for abuse of discretion.[72] To assist in determining whether the military judge abused her discretion in denying a requested instruction, we apply the following three-part test from *United States v. Carruthers*: (1) Is the requested instruction correct? (2) Does the main instruction substantially cover the requested material? (3) Does the instruction cover a point that is so vital that failure to give it deprived Appellant "of a defense or seriously impaired its effective presentation"?[73] "All three prongs must be satisfied for there to be error."[74]

Here, the military judge provided the following entrapment instruction to the members drawn verbatim from the *Military Judges' Benchbook*:[75]

> The evidence raised the issue of entrapment in relation to the offense of attempt.

> "Entrapment" is a defense when the government agents, or people cooperating with them, cause an innocent person to commit a crime which otherwise would not have occurred. The accused cannot be convicted of the offense of attempt if he was entrapped.

> An "innocent person" is one who is not predisposed or inclined to readily accept the opportunity furnished by someone else to commit the offense charged. It means that the accused must have committed the offense charged only because of inducements, enticement, or urging by representatives of the government. You should carefully note that if a person has a predisposition, inclination, or intent to commit an offense or is already involved in unlawful activity, which the government is trying to uncover, the fact that an agent provides opportunities or facilities or assists in the commission does not amount to entrapment. You should be aware that law enforcement agents can engage in trickery and provide opportunities for criminals to commit an offense, but they cannot create criminal intent in otherwise innocent persons and thereby cause criminal conduct.

> The defense of entrapment exists if the original suggestion and initiative to commit the offense originated with the government, not the accused, and the accused was not predisposed or

---

[72] *Id.* at 14.

[73] *Id.* (citing *United States v. Carruthers*, 64 M.J. 340, 346 (C.A.A.F. 2007)).

[74] *Id.* (citing *United States v. Barnett*, 71 M.J. 248, 253 (C.A.A.F. 2012)).

[75] Dep't of the Army Pam. 27-9, Legal Services: Military Judges' Benchbook para. 5-6 (Feb. 29, 2020) [Benchbook].

inclined to commit the offenses. Thus, you must balance the accused's resistance to temptation against the amount of government inducement. The focus is on the accused's latent predisposition, if any, to commit the offense, which is triggered by the government inducement.

> In deciding whether the accused was entrapped, you should consider all evidence presented on this matter. The prosecution's burden of proof to establish the guilt of the accused applies to the elements of the offenses but also to the issue of entrapment. In order to find the accused guilty, you must be convinced beyond a reasonable doubt that the accused was not entrapped.[76]

The Defense's requested instruction, on the other hand, included the following additional language:

> Thus, the prosecution must prove beyond a reasonable doubt that the accused was disposed to commit the criminal act prior to first being approached by Government agents.

> [T]he Government must prove beyond a reasonable doubt that the accused was predisposed to commit the offenses of sexual assault of a child, sexual abuse of a child, or extramarital sexual conduct, prior to being approached by law enforcement, and independent of any inducement.[77]

This additional instructional language requested by the Defense fails the first prong of the *Caruthers* test because it is incorrect or, at the very least, misleading. As previously discussed, once the defense makes a prima facie showing of inducement and raises the entrapment defense, the burden shifts to the government to prove beyond a reasonable doubt *either* that inducement by the government did not occur *or* that the accused was predisposed to commit the offense. Moreover, while the *Benchbook*'s entrapment instruction could perhaps benefit from a more robust discussion of inducement, predisposition, and burden shifting, it does substantially cover the requested material. Nor do we find that the military judge's decision to use the *Benchbook* instruction alone deprived Appellant of a defense or seriously impaired the Defense's effective presentation of his case. Accordingly, our analysis under the *Caruthers* tests leads us to conclude that the military judge did not abuse her discretion in declining to provide Appellant's proposed instruction.

---

[76] Appellate Ex. LXVII at 5.

[77] Appellate Ex. XXXII at 3.

**F. Admission of Evidence to Show Propensity**

We review a military judge's decision to admit evidence for an abuse of discretion.[78] Generally, Military Rule of Evidence [Mil. R. Evid.] 404(b) prohibits "[e]vidence of a crime, wrong, or other act . . . to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character."[79] Put another way, "evidence which is offered simply to prove that an accused is a bad person is not admissible."[80] However, the same evidence "may be admissible for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident."[81] In addition, "[w]hen the defense of entrapment is raised, evidence of uncharged misconduct by the accused of a nature similar to that charged is admissible to show predisposition."[82]

Even when meeting an exception to Mil. R. Evid. 404(b), to be admissible the evidence must pass a three-part test under *United States v. Reynolds*:

> (1) Does the evidence reasonably support a finding by the court members that appellant committed prior crimes, wrongs or acts?
>
> (2) What fact of consequence is made more or less probable by the existence of this evidence?
>
> (3) Is the probative value substantially outweighed by the danger of unfair prejudice?[83]

In conducting part three of this test—the Mil. R. Evid. 403 balancing test—the following non-exclusive factors should be considered:

> the strength of the proof of the prior act; the probative weight of the evidence; the potential to present less prejudicial evidence; the possible distraction of the fact-finder; the time needed to prove the prior conduct; the temporal proximity of the prior

---

[78] *United States v. Harrow*, 65 M.J. 190, 199 (C.A.A.F. 2007).

[79] Mil. R. Evid. 404(b)(1).

[80] *United States v. Reynolds*, 29 M.J. 105, 109 (C.M.A. 1989).

[81] Mil. R. Evid. 404(b)(2).

[82] R.C.M. 916(g), Discussion (citing Mil. R. Evid. 404(b)); *see also United States v. Hunter*, 21 M.J. 240, 242 (C.M.A. 1986).

[83] *Reynolds*, 29 M.J. at 109.

event; the frequency of the acts; the presence of any intervening circumstances; and the relationship between the parties.[84]

Here, Appellant sent messages to two other online personas on the same night as the charged offenses.[85] To one of the personas, Appellant expressed that he was using the social media application because he was "looking for chicks."[86] The second additional persona was, like the persona for the charged offenses, an undercover agent posing as a 13 year-old girl. To this persona Appellant communicated that "we can f[***]," that he was "cool" with her statement that she would be turning 14 in two weeks, and that the persona's age would not bother Appellant "as long as you don't tell me your age."[87]

The military judge ruled Appellant's statements to these additional personas admissible under Mil. R. Evid. 404(b). She concluded that Appellant's statement that he was "looking for chicks" on the night of the charged offense was admissible for the limited purpose of proving Appellant's intent and plan in exchanging messages on the social media platform. We agree, although we do not go so far as to agree with the military judge that a married service member "looking for chicks" on social media should not be considered "[e]vidence of a crime, wrong, or other act" for purposes of Mil. R. Evid. 404(b). However, we do find that the evidence is independently relevant because it shows Appellant's intent or plan with respect to being on the social media application. Further, in weighing the *Wright* factors above, we find that the probative value of the evidence is not substantially outweighed by the danger of unfair prejudice. The military judge did not abuse her discretion in admitting Appellant's statement that he was "looking for chicks" on social media on the night of his charged conduct.

The military judge also admitted Appellant's sexually-charged conversations with the second undercover agent posing as a different 13-year-old girl for the limited purposes of proving Appellant's intent, motive, plan, and awareness of his guilt or wrongfulness of his actions. We find these conversations, which also took place on the same night as his charged misconduct, to be highly probative in this regard. The conversations occurred nearly simultaneously with the charged conduct, with another purported 13-year-old girl, and covered much of the same sexual subject matter. This is also very strong predisposition

---

[84] *United States v. Berry*, 61 M.J. 91, 95 (C.A.A.F. 2005) (citing *United States v. Wright*, 53 M.J. 476, 482 (C.A.A.F. 2000)).

[85] Appellate Ex. XXIII at 2.

[86] *Id.*

[87] *Id.* at 3.

evidence, which is allowed to be admitted once an accused raises the entrapment defense, as Appellant did here. Further, in weighing the *Wright* factors above, we do not find that the probative value of these statements is substantially outweighed by the danger of unfair prejudice. Accordingly, the military judge did not abuse her discretion in admitting these conversations.

## G. Legal and Factual Sufficiency

Appellant further asserts that the evidence is legally and factually insufficient to support his convictions. We review legal and factual sufficiency de novo.[88]

Legal sufficiency requires us to consider the evidence in the light most favorable to the government and determine whether "a reasonable fact-finder could have found all the essential elements beyond a reasonable doubt."[89] In doing so, we "draw every reasonable inference from the evidence of record in favor of the prosecution."[90]

Factual sufficiency, on the other hand, requires that we weigh the evidence in the record of trial, make allowances for not having observed and heard the witnesses, then ask whether we are independently convinced of the appellant's guilt beyond a reasonable doubt.[91] In doing so, we apply "neither a presumption of innocence or a presumption of guilt."[92] "Reasonable doubt, however, does not mean the evidence must be free from conflict."[93]

The entirety of Appellant's argument rests on the assertion that the evidence is insufficient to prove beyond a reasonable doubt that he was not entrapped. We disagree. We find the evidence proves beyond a reasonable doubt that Appellant traveled to a residence in an attempt to engage in extramarital sexual conduct with a person he thought was 13 years old and to whom he had been communicating indecent language online. We further find the evidence

---

[88] Art. 66(d), UCMJ; *United States v. Washington*, 57 M.J. 394, 399 (C.A.A.F. 2002).

[89] *United States v. Turner*, 25 M.J. 324, 324-25 (C.M.A. 1987) (citing *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)).

[90] *United States v. Gutierrez*, 74 M.J. 61, 65 (C.A.A.F. 2015).

[91] *Turner*, 25 M.J. at 325.

[92] *Washington*, 57 M.J. at 399.

[93] *United States v. Rankin,* 63 M.J. 552, 557 (N-M. Ct. Crim. App. 2006).

proves beyond a reasonable doubt that Appellant was not entrapped—specifically, that he was not induced and that he was predisposed to commit these offenses.

### 1. Attempted Sexual Assault of a Child.

To sustain the conviction for attempted sexual assault of a child in violation of Article 80, UCMJ, the Government must have proven beyond a reasonable doubt: (1) that Appellant did a certain overt act; (2) that the act was done with the specific intent to commit sexual assault of a child under Article 120b, UCMJ; (3) that the act amounted to more than mere preparation; and (4) that the act apparently tended to effect the commission of the intended offense.[94] The elements of the target offense of sexual assault of a child under Article 120b are that (1) Appellant committed a sexual act upon a child; and (2) the child had attained the age of 12 years, but had not attained the age of 16 years.[95]

In order for an act to amount to more than mere preparation, it must be "conduct strongly corroborative of the firmness of the defendant's criminal intent," or a "substantial step" towards completing the offense.[96] To be a substantial step, the conduct "must unequivocally demonstrate that the crime will take place unless interrupted by independent circumstances."[97] "Online dialogue must be analyzed to distinguish hot air and nebulous comments from more concrete conversation that might include making arrangements for meeting the supposed minor, agreeing on a time and place for a meeting, making a hotel reservation . . . or traveling to a rendezvous point."[98] Travel generally constitutes a substantial step for child sex offenses, but "is not a sine qua non of finding a substantial step."[99]

We are convinced beyond a reasonable doubt that Appellant attempted to sexually assault a child. After a sexually-charged conversation in which he indicated to a person he thought was a 13-year-old girl that he wanted to "do"

---

[94] *Manual for Courts-Martial, United States* [*MCM*], pt. IV, para. 4.b. (2019 ed.).

[95] *MCM*, pt. IV, paras. 60.a.(g), 62.b.(2)(a).

[96] *United States v. Winckelmann*, 70 M.J. 403, 407 (C.A.A.F. 2011).

[97] *Id.* (internal citations and quotation marks omitted).

[98] *Id.* at 408 (internal citations and quotation marks omitted).

[99] *Id.* at 407. *See also United States v. Olaya*, No. 201900211, 2020 CCA LEXIS 413 at *5 (N-M. Ct. Crim. App. Nov. 16, 2020) (unpublished).

her, he drove with a box of condoms to the location the fictitious underage persona said was her home.[100] Having reviewed the entirety of the record and after weighing the evidence anew, we find the evidence legally and factually sufficient to support his conviction of attempted sexual assault of a child.

### 2. *Attempted Sexual Abuse of a Child*

In order to sustain the conviction for attempted sexual abuse of a child in violation of Article 80, UCMJ, the Government must have proven beyond a reasonable doubt: (1) that Appellant did a certain overt act; (2) that the act was done with the specific intent to commit sexual abuse of a child under Article 120b, UCMJ; (3) that the act amounted to more than mere preparation; and (4) that the act apparently tended to effect the commission of the intended offense.[101] The elements of the target offense of sexual abuse of a child under Article 120b are that (1) Appellant committed a lewd act upon a child by intentionally communicating to her indecent language, to wit: discussing sexual desires;[102] (2) at the time, the child had not attained the age of 16 years; and (3) Appellant did so with the intent to arouse or gratify the sexual desire of any person.[103] "Indecent language" is language that is

> grossly offensive to modesty, decency, or propriety, or shocks the moral sense, because of its vulgar, filthy, or disgusting nature, or its tendency to incite lustful thought. Language is indecent if it tends reasonably to corrupt morals or incite libidinous thoughts. The language must violate community standards.[104]

Here, we find that discussing sexual desires through phrases including that Appellant wanted to "do" someone he believed was a 13-year-old girl is grossly offensive to modesty, shocks the moral sense, violates community standards, and is filthy, vulgar, and disgusting in nature. Having reviewed the entirety of the record and after weighing the evidence anew, we find the evidence legally and factually sufficient to support his conviction.

---

[100] Pros. Ex. 4 at 2. That Appellant actually stated he wanted to "do" the persona prior to being told her age is negated by the fact that, after being told her age (13), Appellant asked if she was ready to do what "we already established." Pros. Ex. 6.

[101] *MCM*, pt. IV para. 4.b.

[102] The words "Sending a picture of a box of condoms" were excepted from the Specification and Appellant was found Not Guilty of them.

[103] *MCM*, pt. IV paras. 62.a.(h)(5)(C), 62.b.(3).

[104] *MCM*, pt. IV para. 104.c.

### 3. Attempted Extra-Marital Sexual Conduct

In order to sustain the conviction for attempted extramarital sexual conduct in violation of Article 80, UCMJ, the Government must have proven beyond a reasonable doubt: (1) that Appellant did a certain overt act; (2) that the act was done with the specific intent to commit extramarital sexual conduct under Article 134, UCMJ; (3) that the act amounted to more than mere preparation; and (4) that the act apparently tended to effect the commission of the intended offense.[105] The elements of the target offense of extramarital sexual conduct, in violation of Article 134, UCMJ, are that: (1) Appellant wrongfully engaged in extramarital conduct with a person; (2) that at the time Appellant knew that he was married to someone else; and (3) that under the circumstances Appellant's conduct was of a nature to bring discredit upon the armed forces.[106] "Extramarital conduct" includes genital to genital, oral to genital, anal to genital, and oral to anal sexual intercourse.[107]

As discussed above, we find beyond a reasonable doubt that Appellant's actions constituted a substantial step to engage in extramarital sexual conduct with someone he knew was not his wife, which under the circumstances was conduct of a nature to bring discredit upon the armed forces. Having reviewed the entirety of the record and after weighing the evidence anew, we find the evidence legally and factually sufficient to support his conviction.

### 4. Entrapment

As discussed above, entrapment is an affirmative defense that "the criminal design or suggestion to commit the offense originated in the Government and the accused had no predisposition to commit the offense."[108]

> The defense has the initial burden of going forward to show that a government agent originated the suggestion to commit the crime. Once the defense has come forward, the burden then shifts to the [g]overnment to prove beyond a reasonable doubt that the criminal design did not originate with the [g]overnment or that the accused had a predisposition to commit the offense.[109]

---

[105] *MCM,* pt. IV para. 4.b.

[106] *MCM*, pt. IV para. 99.b.

[107] *MCM*, pt. IV para. 99.c.2.

[108] R.C.M. 916(g).

[109] *Hall*, 56 M.J. at 436 (quoting *Whittle*, 34 M.J. at 208).

Government origination, or inducement, occurs when a government actor "creates substantial risk that an undisposed person or otherwise law-abiding citizen would commit the offense." [110] It includes "pressure, assurances that a person is not doing anything wrong, persuasion, fraudulent representations, threats, coercive tactics, harassment, promises of reward, or pleas based on need, sympathy, or friendship."[111] Inducement does not include government actors "merely provid[ing] the opportunity or facilities to commit the crime or use artifice or stratagem."[112] Further, generally, repeated requests "do not in and of themselves constitute the required inducement."[113]

After reviewing the record of trial, we find that Appellant met his initial burden to show that contact originated with the Government, providing some evidence of inducement, but that the Government ultimately proved beyond a reasonable doubt that Appellant was not induced, that he was predisposed to commit the offenses, and that he was, therefore, not entrapped.

> a. Inducement

First, we address inducement. Here, the government originated the contact with Appellant through a social media post that did not convey that it was from an underage female, to which Appellant initially responded. After transferring the communication from social media to text messaging, the undercover agent stated she was not looking to go downtown or see a movie. When Appellant asked what she was looking for, the agent responded "u know lol" with emojis of hear-no-evil and see-no-evil monkeys—covering their ears and eyes, respectively.

Appellant was the first to turn the conversation overtly sexual, stating that he wanted to take the persona to his place to "do" her.[114] When the undercover agent disclosed that she was 13 years old, Appellant initially broke contact, saying "[never mind] I'm good," and "Sorry," to which the agent replied, "dam I was takin pics 4u but watevs" and sent him a filtered picture of "herself" with her middle finger up.[115] Within one minute, Appellant re-engaged by asking if

---

[110] *Id.* (quoting *Howell*, 36 M.J. at 359–60).

[111] *Id.* (internal quotation marks omitted).

[112] *Id.* (quoting *Howell*, 36 M.J. at 359–60).

[113] *Id.* (internal quotation marks omitted).

[114] Pros. Ex. 4 at 2.

[115] *Id.* at 3.

she had other social media, saying he did not "want to risk anything," and renewing his request for pictures.[116] The agent then asked, "so u still wanna do me or wat?" Appellant responded, "What's the address?"[117]

After Appellant received the address—and several messages about exactly where and how to meet—he drove to the address with a box of condoms, parked his car, and walked to the house where he believed a 13-year-old girl waited inside for him. During the drive to the house, Appellant and the agent spoke on the phone. They discussed whether they should meet at a gas station down the street from the house, and the agent persisted that he should come to the residence. Once Appellant arrived on base it was a fait accompli that Appellant would be arrested. However, due to safety concerns, the agents wanted to make the arrest at the house. Once at the residence, when Appellant expressed reservations about actually going inside, the Agent assured him there was no one else there. During the call, the agent asked Appellant what they were going to do when he picked her up, and he replied, "we already established that."[118]

Appellant was not pressured, assured that he was not doing anything wrong, threatened, coerced, harassed, promised reward, or answering a plea based on need, sympathy, or friendship. [119] While he may have been persuaded or been provided false information, we find beyond a reasonable doubt that under these circumstances, Appellant was not induced because the entirety of law enforcement's actions constituted "merely provid[ing] the opportunities or facilities to commit the crime . . . [and] us[ed] artifice or stratagem" via "repeated requests."[120]

### b. Predisposition

Second, we address predisposition. Appellant points to his hesitancy to actually go into the house after driving there as lack of predisposition and also to his brother's testimony that he had never expressed interest in underage girls before. However, significant predisposition evidence was properly admitted that included Appellant's additional sexual conversations with another undercover agent, also pretending to be a 13-year-old, in which he stated her age

---

[116] *Id.*

[117] *Id.* at 3.

[118] Pros. Ex. 6; Appellate Ex. LV at 2.

[119] *See Hall*, 56 M.J. at 436 (quoting *Howell*, 36 M.J. at 359–60) (internal quotation marks omitted).

[120] *Id.* (quoting *Howell*, 36 M.J. at 359–60).

would not bother him "as long as you don't tell me your age."[121] This statement, which came after the undercover agent had already disclosed that she was turning 14 soon and after a discussion on the topic of sex, occurred the same night as the charged offenses.

Finally, we address Appellant's hesitancy to actually enter the house and the multiple conversations with the undercover agent where she refused to come out of the house and asked Appellant to come in. We find that Appellant's "hesitancy about continuing [in his criminality] appears not to have resulted from a reluctance to commit [] offenses but, instead, from a fear of apprehension; and we do not equate such a fear to lack of predisposition."[122]

In conversations with both undercover agents posing as the same 13-year-old girl, Appellant expressed a fear of apprehension, stating that he "cant [sic] get busted,"[123] had "more to lose" in talking to them,[124] and that he did not "want to risk anything."[125] There was other evidence that clearly indicated Appellant's hesitancy resulted from fear of apprehension rather than lack of predisposition. The search history on Appellant's phone, which was admitted into evidence, reveals that between conversations with the agents, Appellant conducted internet searches using terms such as, "How to Catch a Predator Sex Sting Operations" and whether police could be "predatory and lure you into doing something when charging you."[126] For these reasons, we find beyond a reasonable doubt that Appellant was predisposed to commit these offenses.

Having reviewed the entirety of the record and after weighing the evidence anew, making allowances for not having personally observed the witnesses, we find the evidence legally and factually sufficient to prove that Appellant was not entrapped.

**H. Unanimous Verdict Instruction.**

We granted Appellant's Motion to File a Supplemental Assignment of Error for the denial of his trial-level motion seeking an instruction that the members' findings must be unanimous. The Supreme court held in *Ramos v. Louisiana*

---

[121] Pros. Ex. 8.

[122] *United States v. Clark*, 28 M.J. 401, 406 (C.M.A. 1989).

[123] Pros. Ex. 4 at 6.

[124] Pros. Ex. 7 at 9.

[125] Pros. Ex. 4 at 3.

[126] Pros. Ex. 10.

that the Fourteenth Amendment, incorporating the Sixth Amendment's right to a trial by an impartial jury, provides a right to unanimous verdicts in state criminal trials for serious offenses.[127] In *United States v. Causey*, we analyzed the effect of *Ramos* on Article 52, UCMJ.[128] In Causey we held that the "Sixth Amendment right to trial by an impartial jury of the State and district wherein the crime shall have been committed is one of the safeguards that does *not* apply to courts-martial and that "the law regarding the impartiality of court-martial panels generally derives from R.C.M. 912 and Articles 25 and 41, UCMJ, not the Sixth Amendment."[129] In so holding, we determined that *Ramos*'s unanimous verdict requirement did not reach military courts and that "it is the prerogative of our superior court, not this one, to overturn its own precedents," a sentiment we echo here.[130]

## III. CONCLUSION

After careful consideration of the record and briefs of appellate counsel, we have determined that the findings and sentence are correct in law and fact and that no error materially prejudicial to Appellant's substantial rights occurred.[131]

The findings and sentence are **AFFIRMED**.



FOR THE COURT:

KYLE D. MEEDER
Clerk of Court

---

[127] 140 S. Ct. 1390 (2020).

[128] Article 52, UCMJ, provides that in a general or special courts-martial with members, the concurrence of at least three-fourths of the members present when the vote is taken is required to reach guilty findings and a sentence, except in capital cases, in which unanimity is required for both the findings and the sentence.

[129] *United States v. Causey*, __ M.J. __, 2022 CCA LEXIS 176, *27 (N-M. Ct. Crim. App. Mar. 23, 2022) (internal quotation marks and citations omitted) (emphasis in original).

[130] *Id.* at *28.

[131] Articles 59 & 66, UCMJ.